1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CITY OF ROYAL OAK RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> JUNIPER NETWORKS, INC., KEVIN R. JOHNSON, ROBYN M. DENHOLM, and SCOTT G. KRIENS, <br><br> Defendants. | CASE NO.: 5:11-CV-04003-LHK <br><br> ORDER GRANTING JUNIPER'S MOTION TO DISMISS WITHOUT PREJUDICE; AND GRANTING KRIENS' MOTION TO DISMISS WITHOUT PREJUDICE |

This is a putative securities fraud class action on behalf of all persons who purchased or otherwise acquired Juniper common stock between July 20, 2010, and July 26, 2011, inclusive (the "Class Period") against Defendants Juniper Networks, Inc. ("Juniper," "Juniper Networks" or the "Company), Kevin R. Johnson ("Johnson"), Robyn M. Denholm ("Denholm"), and Scott G. Kriens ("Kriens") (collectively, "Defendants"). Lead Plaintiffs City of Omaha Police and Fire Retirement System and City of Bristol Pension Fund ("Plaintiffs") assert claims against all Defendants for violations of §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities Exchange Commission ("SEC") Rule 10b-5. Plaintiffs additionally assert claims against all Individual Defendants for violations of §§ 20(a) and 20A of the Exchange Act. Before the Court

are two motions.  Juniper Networks, Johnson, and Denholm move to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.  *See* ECF No. 54 ("Juniper Motion").  Kriens separately moves to dismiss, based on the arguments raised in the Juniper Motion and based on additional grounds for dismissal specific to Kriens.  *See* ECF No. 53 ("Kriens Motion").  Both motions are fully briefed.  *See* ECF No. 69 ("Opp'n to Juniper"); ECF No. 70 ("Opp'n to Kriens"); ECF No. 76 ("Juniper Reply"); ECF No. 73 ("Kriens Reply").  The Court found this matter appropriate for determination without oral argument and accordingly vacated the hearing set for July 19, 2012.  *See* Civ. L.R. 7-1(b).  For the reasons explained below, the Court GRANTS Defendants Juniper Networks', Johnson's, and Denholm's motion to dismiss, and GRANTS Defendant Kriens' motion to dismiss, both with leave to amend.

## I.  BACKGROUND

### A.  Procedural History

The City of Royal Oak Retirement System ("City of Royal Oak") filed a private securities class action complaint against Defendants on August 15, 2011.  ECF No. 1.  After the City of Royal Oak published the pendency of this action on August 16, 2011, three parties moved the Court for appointment as lead plaintiff and for approval of lead counsel: (1) City of Omaha Police and Fire Retirement System and City of Bristol Pension Fund (collectively, the "Public Retirement Systems"), *see* ECF No. 17; (2) Stationary Engineers Local 39 Pension Trust Fund, *see* ECF No. 19; and (3) Roofers Local No. 149 Pension Fund and Steamship Trade Association-International Longshoremen's Pension Benefit Fund, *see* ECF No. 21.  Only the Public Retirement Systems' motion was unopposed.  On January 9, 2012, pursuant to 15 U.S.C. § 78u-4 governing the selection of a lead plaintiff in private securities class actions, the Court appointed the Public Retirement Systems lead plaintiff, and appointed Scott+Scott LLP lead counsel.  ECF No. 42.  Lead Plaintiffs Public Retirement Systems (hereinafter "Plaintiffs") filed an Amended Complaint on February 23, 2012.  ECF No. 47 ("AC").

### B.  Factual Allegations

This is a putative securities fraud class action on behalf of all persons who purchased or otherwise acquired Juniper common stock between July 20, 2010, and July 26, 2011, inclusive (the

**United States District Court**
For the Northern District of California

2

United States District Court
For the Northern District of California

"Class Period"). *See* AC ¶ 2.  Defendant Juniper Networks is a technology company that designs and sells communications networking and security equipment and software. *Id.* ¶¶ 3, 21.  Juniper's primary communications networking product and service offerings are its core routers and switches, which allow customers to move voice, video, and data traffic across their networks. *Id.* ¶ 3.  Juniper also specializes in security products and software that enable the secure and efficient operation of data networks. *Id.*  Juniper's operations are organized into two reportable segments: "Infrastructure," which offers scalable routing and switching products; and "Service Layer Technologies" ("SLT"), which offers products designed to protect its customers' networks. *Id.* ¶ 4. Juniper sells its products to both "Service Providers," such as Verizon and AT&T, and to "Enterprise" customers, meaning large entities such as corporations, universities, financial institutions, and the federal government. *Id.* ¶ 5.  During the Class Period, Juniper Networks had between 519 and 533 million shares of common stock outstanding, which were traded in an efficient market on the NASDAQ National Market under the ticker symbol "JNPR." *Id.* ¶ 21.

The Individual Defendants were employed at Juniper Networks during the Class Period. Defendant Kriens was Chairman of Juniper's Board of Directors during the Class Period, a position he has held since the company was founded in 1996. *Id.* ¶ 22.  Kriens was also Juniper's Chief Executive Officer ("CEO") from 1996 to 2008, when Defendant Johnson became CEO. *Id.*  Kriens remained a salaried employee of Juniper until April 1, 2011, when he became its "non-executive Chairman. *Id.*  Plaintiffs allege that, during the Class Period, Kriens "received daily reports and/or had ready access to Juniper's computerized systems containing up-to-date information regarding Juniper's sales, product demand, expenses and inventory," and "was intimately knowledgeable about all aspects of Juniper's business operations." *Id.*  Specifically, Plaintiffs allege that Kriens reviewed, prepared, and signed the Shelf Registration Statement Juniper filed with the SEC on August 10, 2010, which incorporated by reference any "additional documents that [Juniper would] file with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act prior to the completion or termination of the offering, including all such documents [Juniper would] file with the SEC after the date of the initial registration statement and prior to the effectiveness of the

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

1   registration statement . . . ."  *Id.* (emphasis omitted).  Kriens also reviewed, approved, and signed

2   the 2010 Form 10-K filed with the SEC on February 25, 2011.  *Id.*

3        Defendant Johnson was, during the Class Period, President, CEO, and a director of Juniper.

4   *Id.* ¶ 23.  Defendant Denholm was, during the Class Period, Executive Vice President and Chief

5   Financial Officer ("CFO").  *Id.* ¶ 24.  Plaintiffs allege that both Johnson and Denholm were

6   "hands-on manager[s]."  *Id.* ¶¶ 23-24.  Plaintiffs further allege that both Johnson and Denholm

7   were "intimately involved in the preparation of Juniper's financial statements and earnings

8   guidance," and in particular that they made various public statements for the Company during the

9   Class Period, and participated in all Class Period earnings conferences, as well as the 2010 and

10  2011 Analyst Day Conferences.  *Id.*  Plaintiffs also allege that Johnson and Denholm reviewed,

11  approved, and signed several of Juniper's SEC filings during the Class Period, including the

12  August 10, 2010 Registration Statement, the 2010 Form 10-K, and the Sarbanes-Oxley certificates

13  filed with all quarterly financial reports on Form 10-Q.  *Id.*

14       Plaintiffs allege that during the Class Period, Defendants issued various materially false and

15  misleading statements regarding the Company's business practices and financial results, which

16  caused the Company's stock to be traded at artificially inflated prices during the Class Period,

17  reaching a high of $45 per share on March 8, 2011.  *Id.* ¶¶ 8-14.  Plaintiffs allege that Defendants

18  repeatedly made false or misleading statements or omissions during the course of press releases

19  relating to Juniper's quarterly and yearly earnings, conference calls accompanying those press

20  releases, quarterly and annual filings with the SEC, and investor events attended by the Individual

21  Defendants.  *See id.* ¶¶ 67-139.  Although Plaintiffs cite voluminous examples of allegedly

22  misleading statements spanning the Class Period, Plaintiffs effectively accuse Defendants of two

23  broad categories of misleading conduct: (1) misleading statements regarding Juniper's future

24  growth prospects, and (2) insufficient disclosures of Juniper's adoption of new accounting

25  practices.

26       First, Plaintiffs allege that Defendants failed to disclose material facts about Juniper's

27  business operations that were necessary to prevent the Company's long-term growth projections

28  from being misleading.  Plaintiffs allege that on February 23, 2010, Juniper hosted an Analyst Day

**United States District Court**
For the Northern District of California

4

United States District Court
For the Northern District of California

1  Conference with analysts and investors, during which Defendants set out a long-term business plan

2  calling for 20% or higher revenue growth and a 25% or higher operating margin over the next three

3  to five years.  *Id.* ¶ 26.  At the Conference, Denholm stated that there were "two factors that we

4  believe will drive our growth, and that is our innovation and our expanding routes market," and

5  that Juniper was "strengthening [its] channel and generating demand through [its] connective sales

6  and marketing programs."  *Id.*  Denholm also justified the plan for a 25% operating margin by

7  saying "[t]he main actor that will drive this margin expansion are the growth in revenue and a

8  continued focus on our operational excellence."  *Id.*

9       Throughout the Class Period, Juniper reported seemingly robust revenue and profit growth

10  consistent with achieving its announced long-term business plan of 20+% year-over-year revenue

11  growth and 25+% operating margins.  *Id.* ¶¶ 8, 27.  During the Class Period, Defendants attributed

12  these results to the strength of the Company's product offerings, strong demand for its services, and

13  skillful execution of its business plan.  *Id.* ¶ 8.  Defendants' representations, combined with the fact

14  that Cisco, Juniper's competitor, was concurrently downgrading its own financial guidance during

15  the Class Period, misled investors into believing that Juniper was gaining market share at Cisco's

16  expense.  *Id.* ¶¶ 8-9.  The allegedly misleading statements regarding Juniper's future prospects

17  were primarily made during investor conference calls.  Such statements tended to include

18  optimistic predictions for Juniper's future growth as well as favorable interpretations of Juniper's

19  recent performance.  For instance, Defendant Denholm told investors during one such conference

20  call:

21       As we outlined at our financial analyst day in February, we are on a multi-year
22       growth agenda.  Our investments in R&D, our M&A strategy, and our go-to-market
         plan are all aimed at delivering against our long-term model of 20% or higher
23       revenue growth and 25% or higher operating margin.  As we continue to execute on
         our operating principles for 2010, we are confident that for 2010, our topline growth
24       will be consistent with our long-term model. . . .  For the full year, we remain
         committed to growing our revenue faster than our operating expenses resulting in
25       profitable growth for the company.

26  *Id.* ¶ 71.  Plaintiffs allege, however, that despite continued reassurances from Defendants that the

27  long-term business plan was reasonably premised on strong business fundamentals, Juniper was

28

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

1  afflicted with a number of serious problems that would hamper long term growth.  Based on the

2  personal knowledge, information, and belief of five confidential witnesses ("CWs"), Plaintiffs

3  allege that Defendants acted intentionally, or at least acted with deliberate recklessness, in

4  withholding material information from the market, including the fact that: (1) Juniper lacked the

5  sales personnel to sell its sophisticated and expensive MX routers in the volumes required to meet

6  Juniper's touted growth levels; (2) slumping sales at major enterprise customers, including IBM,

7  led to decreased demand for Juniper products; (3) Juniper's SRX Series security products – a key

8  product line of the Company's SLT business segment – suffered from compatibility issues; (4) the

9  "Intrusion, Detection and Prevention" ("IDP") component of the SRX system suffered from serious

10  bugs, leading to IBM's refusal to purchase the system; (5) large customers such as Verizon and

11  Sprint were growing frustrated with Juniper's SRX system; (6) Juniper faced significant pricing

12  pressure from competitors; and (7) by the end of the first quarter of fiscal year 2011 (FY11), all six

13  geographic territories for Verizon channel sales were below (less than 50%) their quarterly 2011

14  targets.  *See id.* ¶¶ 30-43.  Plaintiffs allege that Defendants' failure to disclose this information

15  amounted to a material omission that misled investors.

16         Second, Plaintiffs allege that Defendants' statements about its revenue and operating margin

17  growth were rendered misleading because Defendants failed to adequately disclose the full impact

18  of the Company's early adoption of new revenue recognition rules.  *Id.* ¶ 11.  In October 2009, the

19  Financial Accounting Standards Board ("FASB") issued new revenue recognition rules, ASU 2009-

20  13 and ASU 2009-14, for the sale of multiple-deliverable arrangements (e.g., equipment plus

21  software and services) and for the sale of products that include software.  *Id.* ¶¶ 45-46; Decl. of

22  Joni Ostler, ECF No. 55 ("Ostler Decl."), Exs. 43-44.  These new rules governing the accounting of

23  multiple-deliverable arrangements were designed to enable vendors such as Juniper to account for

24  the sale of products and services separately rather than as a combined unit, as was required under

25  the old rules.  AC ¶ 45.  Under the old rules, revenue from multiple-deliverable arrangements could

26  not be recognized until everything had been delivered.  For instance, if Juniper sold a piece of

27  hardware or software with ongoing maintenance or service obligations, Juniper would have to defer

28  recognition of a significant portion of the total sales price over the life of the service or

United States District Court
For the Northern District of California

maintenance obligation.  Thus, under the old accounting rules, a relatively inexpensive portion of the total sale could hold up recognition of a far more substantial portion of the sales price.  Under the new rules, companies were given significant discretion to determine the fair value of the undelivered portion of the ongoing obligation and were required only to defer revenue recognition on the undelivered portion of the sale.  *Id.* ¶¶ 45-46.

By transitioning to the new rules, companies would be able to recognize revenue earlier than they could under the old rules.  Recognizing that, during the transition year, this early recognition would create what appeared to be a revenue boost, which could have a significant impact on year-to-year comparison of financial statements, the FASB required companies in the transition period to disclose "information that enables users of [their] financial statements to understand the effect of adopting the [new rules]."  Ostler Decl. Ex. 43 at 3; *see* AC ¶ 50.  In particular, the FASB provided that:

> To satisfy that objective, vendors are required to disclose at a minimum the following qualitative information by similar types of arrangements:
> 1. A description of any change in the units of accounting
> 2. A description of the change in how a vendor allocates the arrangement consideration to various units of accounting
> 3. A description of the changes in the pattern and timing of revenue recognition
> 4. Whether the adoption of this update is expected to have a material effect on financial statements in periods after the initial adoption.
>
> If the adoption of the [new rules] does have a material effect on financial statements, vendors will be required to supplement the qualitative information with quantitative information to satisfy the objective of describing the effect of the change in accounting principle.  Depending on a vendor's facts and circumstances, the following are examples of methods (but not the only potential methods) that may individually or in combination provide quantitative information to satisfy that objective:
> 1. Disclosure of the amount of revenue that would have been recognized in the year of adoption if the related arrangements entered into or materially modified after the effective date were subject to the measurement requirements of [the old rules].
> 2. Disclosure of the amount of revenue that would have been recognized in the year preceding the year of adoption if the arrangements accounted for under [the old rules] were subject to the measurement requirements of the [new rules].

3.  Disclosure of the amount of revenue recognized in the reporting period and the amount of deferred revenue as of the end of the reporting period from applying (a) the guidance in [the old rules] and (b) the [new rules].

Ostler Decl. Ex. 43 at 3-4; *see* AC ¶¶ 50-51.  Companies were required to adopt the new accounting rules by fiscal year 2011 ("FY11"), but early adoption of the new rules was permitted. Ostler Decl. Ex. 43 at 5; *see* AC ¶ 51.

Juniper opted to become one of the first early adopters of rules ASU 2009-13 and ASU 2009-14, effective January 1, 2010.  AC ¶ 51.  Plaintiffs allege that, throughout the Class Period, Defendants took advantage of the inflated numbers that resulted from the Company's early adoption of the new accounting practices without properly abiding by the associated disclosure requirements, thereby misleading investors.  For example, on July 20, 2010, Juniper issued a press release, followed by an earnings call, announcing the Company's preliminary 2Q10 financial results, which Defendants had filed with the SEC that day on Form 8-K.  Juniper reported that revenue increased 24% on a year-over-year basis to $978.3 million, and reporting a non-GAAP[1] operating margin of 23.9%.  AC ¶ 67.  Plaintiffs accuse Defendants of: (1) omitting any reference to the Company's early adoption of ASU 2009-13 and ASU 2009-14; (2) failing to explain that an additional $53 million in revenue in 2Q10 was attributable solely to the new accounting rules; (3) failing to disclose that the beneficial impact of the rules change was only temporary and would disappear in FY11, once the higher deferred revenues recorded in earlier periods were recognized and not replaced; and (4) failed to disclose that the accounting rule change provided an additional benefit to operating margins beyond the higher upfront revenues being recognized.  *Id.* ¶ 68. Plaintiffs allege that, but for the bump in revenues and operating margins caused by the new accounting rules, Juniper's actual 2Q10 results were in fact significantly below its reported results for 2Q10 and below its long-term business plan of 20+% growth in revenue and 25+% operating margins.  *Id.*

While Plaintiffs assert that Defendants' disclosures were inadequate, they acknowledge that Defendants did, at various times, disclose their adoption of the new accounting rules.  For example, Plaintiffs allege that on its 1Q10 earnings call, the Company "quantified the impact to both revenue

[1] "GAAP" refers to Generally Accepted Accounting Practice.

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

United States District Court

For the Northern District of California

and EPS from the change in accounting rules." *Id.* ¶ 70.  One of Plaintiffs' complaints, in fact, is

that the Company did not provide the same level of disclosure during the 2Q10 earnings call as it

did during the 1Q10 earnings call.  *Id.*  Plaintiffs also acknowledge that the Company later

disclosed the revenue impact of the new accounting rules in the Company's 2Q10 10-Q, filed on

August 6, 2010.  *Id.*  Juniper's disclosure in its 10-Q for the end of 2Q10 read as follows:

> As a result of the adoption of ASU 2009-13 and ASU 2009-14, net revenues for the three and six months ended June 30, 2010, were approximately $53 million and $78 million higher than the net revenues that would have been recorded under the previous accounting rules.  The increase in revenues was due to recognition of revenue for products booked and shipped during these periods which consisted primarily of $38 million and $60 million for the three- and six- month periods ended June 30, 2010, respectively, related to undelivered product commitments for which we were unable to demonstrate fair value pursuant to the previous accounting standards.  The remainder of the increase in revenue for the three- and six- month periods was due to products sold into multiple-year service arrangements which were recognized ratably under the previous accounting standards and for the change in our allocation methodology from the residual method to the relative selling price method as prescribed by the new standard. . . .
>
> We cannot reasonably estimate the effect of adopting these standards on future financial periods as the impact will vary depending on the nature and volume of new or materially modified arrangements in any given period as well as on changes in our business practices.  However, as ASU 2009-13 and ASU 2009-14 would allow us to recognize revenue for the portion allocated to delivered items in multiple element arrangements and defer revenue for only the portion allocated to the undelivered items, we expect that the magnitude of deferrals related to undelivered product commitments and other items, for which we previously would not have been able to establish VSOE, will gradually decrease over time.

AC ¶¶ 82-83; Ostler Decl. Ex. 5 [2Q10 Form 10-Q] at 6-7.  Plaintiffs assert that the disclosure was

inadequate because it "was buried in paragraphs of text in the 79+ page filing;" it did not

specifically discuss the impact of the new revenue recognition rules on operating margin and EPS;

and it did not describe whether the sales revenue attributable to the change in accounting rules was

from sales in the Enterprise or the SLT segment.  AC ¶¶ 70, 83.  Defendants made similar

disclosures regarding the impact of the new revenue recognition rules in their 3Q10 Form 10-Q and

in their FY10 Form 10-K.  *Id.* ¶¶ 101, 119.

1    Plaintiffs allege that during the Class Period, each of the Individual Defendants had

2 intimate knowledge about all aspects of Juniper's business operations; received daily reports; had

3 ready access to Juniper's computerized systems containing up-to-date information regarding

4 Juniper's sales, product demand, expenses, and inventory; and thus must have known of the

5 material information that they omitted from their public disclosures.  AC ¶¶ 22-24, 164.  Plaintiffs

6 further allege that each of the Individual Defendants reaped significant proceeds from insider sales

7 based on the false and misleading statements or omissions inflating Juniper's stock price during the

8 Class Period.  AC ¶¶ 9, 15.  Specifically, Plaintiffs allege that Individual Defendants Kriens,

9 Johnson, and Denholm collectively sold approximately $146.3 million of Juniper stock at inflated

10 prices during the Class Period.  *Id.* ¶ 165.  Kriens sold over $142 million of Juniper stock during

11 the Class Period, compared to only $39 million of stock in 2009.  *Id.* ¶ 166.  Johnson made a single

12 sale during the Class Period of 32,000 shares on November 8, 2010, worth $1.095 million,

13 compared to no sales in 2009.  *Id.* ¶ 167.  Denholm sold approximately $3.24 million of Juniper

14 stock during the Class Period, compared to only $193,860 of stock in 2009.  *Id.* ¶ 168.  In addition

15 to these stock sales, Plaintiffs allege that Individual Defendants collectively received more than

16 $8.7 million in salary increases, cash bonuses, stock awards, and stock options.  *Id.* ¶ 176.

17    Plaintiffs allege that, once the material information was disclosed to the public on June 1,

18 2011, and July 26, 2011, the Company's stock price fell from its Class Period high of $45 per share

19 on March 8, 2011, to close at $24.66 on July 27, 2011, erasing more than $10.8 billion in market

20 capitalization.  *Id.* ¶¶ 17, 139-57.

21    Based on these and other allegations, Plaintiffs' Amended Complaint asserts causes of

22 action for alleged violations of Sections 10(b), 20(a), and 20A of the Exchange Act and violations

23 of SEC Rule 10b-5.

24    **II.    LEGAL STANDARDS**

25       **A.  Federal Rule of Civil Procedure 12(b)(6)**

26    A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal

27 sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal under

28 Rule 12(b)(6) may be based on either (1) the "lack of a cognizable legal theory," or (2) "the

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). In considering whether the complaint is sufficient to state a claim, the court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). However, the court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055 (internal quotation marks and citations omitted). While a complaint need not allege detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B.  Federal Rule of Civil Procedure 9(b) and the PSLRA

Because Plaintiffs have brought securities fraud claims under the PSLRA, Rule 12(b)(6) is not the only governing legal standard. Plaintiffs must also satisfy the heightened pleading standards set forth by Rule 9(b) of the Federal Rules of Civil Procedure and by the PSLRA itself, the latter of which has imposed "formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6)." *Metzler Inv. Gmbh v. Corinthina Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008); *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

In addition, the PSLRA requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter." *Zucco Partners*, 552 F.3d at 990 (citation omitted); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). With respect to falsity, the complaint must "specify each statement alleged to have been misleading, [and] the reason or

11

1   reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  To the extent an allegation is

2   based on information and belief, "the complaint shall state with particularity all facts on which that

3   belief is formed."  15 U.S.C. § 78u-4(b)(1).  In doing so, the plaintiff shall "reveal 'the sources of

4   [his] information.'"  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (quoting

5   *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 975 (9th Cir. 1999)).  With respect to scienter,

6   the complaint must "state with particularity facts giving rise to a strong inference that the defendant

7   acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  That is, plaintiffs must plead with

8   particularity the facts evidencing "the defendant's intention 'to deceive, manipulate, or defraud.'"

9   *Tellabs*, 551 U.S. at 313 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976));

10  *see also id.* at 319.  To satisfy the rigorous pleading standards of the PSLRA, the complaint's

11  scienter allegations must give rise not simply to a plausible inference of scienter, but rather to an

12  inference of scienter that is "cogent and at least as compelling as any opposing inference of

13  nonfraudulent intent."  *Tellabs*, 551 U.S. at 314; *see also id.* at 324.

14      **III.     EVIDENTIARY ISSUES**[2]

15          **A.  Plaintiff's Motion to Strike and Objection to Request for Judicial Notice**

16          In connection with their motion to dismiss, Defendants ask this Court to take judicial notice

17  of a total of 56 documents attached as exhibits to the Declaration of Joni Ostler.  *See* Defs.'

18  Request for Judicial Notice, ECF No. 62 ("RJN"); Ostler Decl. & Exs. 1-56.  The vast majority of

19  the documents submitted by Defendants are SEC filings, many of which are referenced in the

20  Amended Complaint.  Defendants also ask the Court to take judicial notice of various analyst

21  reports not referenced in the Complaint, for the sole purpose of demonstrating what information

22  was disclosed to the public.

23

24  _____

   [2]  Both parties filed separate motions to strike the opposing party's documents, in contravention of

25  Civil Local Rule 7-3, which provides that "[a]ny evidentiary and procedural objections to the
   motion must be contained within the brief or memorandum" in opposition or in reply.  *See* Civ.

26  L.R. 7-3(a), (c).  By doing so, the parties impermissibly circumvented both the Civil Local Rule
   page limitations and the Court's Order granting the parties' stipulated request to extend the page

27  limits for the opening and opposition briefs by five pages only.  *See* ECF No. 52.  The parties are
   on notice that, in the future, any evidentiary objection that fails to comply with the Civil Local

28  Rules will be denied outright.

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

1    "Although generally the scope of review on a motion to dismiss for failure to state a claim

2    is limited to the Complaint, a court may consider evidence on which the complaint necessarily

3    relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiffs'

4    claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion."

5    *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks and

6    citations omitted).  The court may "treat such a document as 'part of the complaint, and thus may

7    assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'"

8    *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (quoting *United States v. Ritchie*, 342 F.3d

9    903, 908 (9th Cir. 2003)).  In addition, in deciding a Rule 12(b)(6) motion, courts may consider

10   facts subject to judicial notice.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir.

11   2001).  Under Federal Rule of Evidence 201, facts subject to judicial notice are "adjudicative facts

12   that are 'not subject to reasonable dispute.'  Facts are indisputable, and thus subject to judicial

13   notice, only if they are either 'generally known' under Rule 201(b)(1) or 'capable of accurate and

14   ready determination by resort to sources whose accuracy cannot be reasonably questioned' under

15   Rule 201(b)(2)."  *Ritchie*, 342 F.3d at 909.

16        Plaintiffs do not object to the majority of the documents at issue, and thus the Court takes

17   judicial notice of Exhibits 1-10, 12-22, and 40-56 attached to the Ostler Declaration, all of which

18   are either SEC filings or transcripts of Juniper's earnings calls and thus are proper subjects of

19   judicial notice.  *See Metzler*, 540 F.3d at 1064 n.7 (SEC filings subject to judicial notice on motion

20   to dismiss); *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (same).

21        However, Plaintiffs move to strike the following documents: Juniper's Proxy Statement on

22   Form DEF14, filed with the SEC on April 8, 2011 (Exhibit 11); certain analyst reports regarding

23   Juniper (Exhibits 23-37); and SEC Forms 4 for Kriens and Denholm (Exhibits 38 and 39)

24   (hereafter, collectively "Exhibits").  Pls.' Mot. to Strike RJN at 1-2.  Even more specifically,

25   Plaintiffs move to strike Defendants' arguments that rely on these exhibits to illustrate that: (1)

26   Juniper's employee stock options plan requires employees to exercise their stock options no later

27   than 90 days after termination of employment, *see* Ostler Decl. Ex. 11 at 28; (2) certain information

28   was already known by the public, *see id.* Exs. 23-37; (3) Denholm's stock trades were made

United States District Court
For the Northern District of California

1  pursuant to her 10b5-1 trading plan, established prior to the Class Period, *see id.* Ex. 38; and (4)

2  certain shares were held not by Kriens himself but rather by the Kriens Family Foundation, a

3  501(c)(3) organization, *see id.* Ex. 39.  Plaintiffs contend that Defendants are offering all of the

4  contested Exhibits to prove the truth of the statements contained therein, rather than to prove the

5  existence of those statements, and accordingly argue that the Exhibits, and Defendants' arguments

6  based on them, should be stricken.  Mot. to Strike RJN at 3-5.

7          Plaintiffs' arguments to exclude fail.  While Plaintiffs argue that *none* of Defendants'

8  Exhibits may be offered for the truth of the statements asserted therein, Ninth Circuit precedent

9  says otherwise.  *Marder v. Lopez*, for instance, states that when a complaint references and

10  necessarily relies on a document, the court "may assume that its contents are true for purposes of a

11  motion to dismiss under Rule 12(b)(6)."  450 F.3d at 448 (internal quotation marks and citation

12  omitted).  Juniper's Proxy Statement (Exhibit 11) is explicitly referenced and relied on in the

13  Amended Complaint, *see* AC ¶¶ 23, 175, and Plaintiffs do not contest the authenticity of the copy

14  attached to Defendant's motion to dismiss.  Accordingly, the court may take judicial notice of the

15  document and "may assume that its contents are true for purposes of a motion to dismiss under

16  Rule 12(b)(6)."  *Marder*, 450 F.3d at 44.  Similarly, although Plaintiffs do not explicitly refer to

17  Denholm's and Kriens' Forms 4 in the Amended Complaint, Plaintiffs' scienter and insider trading

18  allegations do rely expressly on Denholm's and Kriens' stock sales, which is information disclosed

19  to the public through Denholm's and Kriens' Forms 4 filed with the SEC.  *See* AC ¶¶ 166, 168.

20  Plaintiffs do not suggest otherwise, nor do they challenge the authenticity of the copies of the

21  Forms 4 attached to Defendants' motion to dismiss.  Moreover, courts may take judicial notice of

22  SEC Forms 4, even when not referenced in the pleading, to prove that stock sales were made

23  pursuant to a Rule 10b5-1 trading plan.  *See, e.g.*, *Cement Masons & Plasterers Joint Pension Trust*

24  *v. Equinix, Inc.*, No. 11-01016, 2012 WL 685344, at *5 n.4, *8 n.5 (N.D. Cal. Mar. 2, 2012).[3]

25  Thus, Exhibits 38 and 39, too, are judicially noticeable.

26  _____

27  [3] Cases cited by Plaintiffs in opposition to this proposition are inapposite.  In *In re Adaptive
   Broadband Sec. Litig.*, No. C 01-1092, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002), for instance, the
28  court refused to take judicial notice of a Form 4 because Plaintiff's complaint made no mention of
   stock sales.  In *In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 221 F. Supp. 2d 1090 (N.D. Cal.

14

Accordingly, Defendant's Request for Judicial Notice is GRANTED, and Plaintiff's Motion to Strike and Objection to Judicial Notice is DENIED with respect to Exhibits 11, 38, and 39. Because the Court need not rely on the various analyst reports (Exhibits 23-37) in ruling on the pending motions to dismiss, and because these analyst reports were not relied upon or referenced in the Amended Complaint, the Court declines to take judicial notice of Exhibits 23 through 37 at this time. Accordingly, Plaintiffs' Motion to Strike and Objection to Judicial Notice is DENIED as moot with respect to Exhibits 23 through 37.

### B.  Defendants' Motion to Strike Declaration of Stuart Harden

Defendants move to strike the Declaration of Stuart Harden, which Plaintiffs submitted in support of their Opposition to Defendants' Motion to Dismiss. As Plaintiffs themselves acknowledge in their Motion to Strike and Objection to Defendants' Request for Judicial Notice, in a ruling on a 12(b)(6) motion, a court cannot consider evidence outside the pleadings without converting the motion to dismiss into one for summary judgment and giving the opposing party an opportunity to respond. *See Ritchie*, 342 F.3d at 907; *Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001). There are only a few limited exceptions to this rule. A court may consider: (1) documents attached to the complaint; (2) documents incorporated by reference in the complaint; and (3) matter that is judicially noticeable under Federal Rule of Evidence 201. *See Ritchie*, 342 F.3d at 907-08. The Harden Declaration falls into none of these categories and thus cannot be considered by the Court for purposes of ruling on the pending motions to dismiss. Accordingly, Defendants' motion to strike the Harden Declaration is GRANTED.

### IV.    JUNIPER'S MOTION TO DISMISS

### A.  Section 10(b) of the Exchange Act and Rule 10b-5

Under Section 10(b) of the Exchange Act, it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or

---

2002), the court actually took notice of an individual's SEC filings detailing stock sales and declined only to take notice of a company's SEC filings because they contained disputed facts. Finally, in *Troy Grp., Inc. v. Tilson*, 364 F. Supp. 2d 1149 (C.D. Cal. 2005), the court based its refusal to consider SEC filings for the truth contained therein exclusively on Fifth Circuit precedent, which is not binding in the Ninth Circuit.

15

1    contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C.

2    § 78j(b); *see also* 17 C.F.R. § 240.10b-5 ("Rule 10b-5").  Rule 10b-5, which is the regulation

3    promulgated under Section 10(b), further provides that it is unlawful "[t]o make any untrue

4    statement of a material fact or to omit to state a material fact necessary in order to make the

5    statements made, in the light of the circumstances under which they were made, not misleading."

6    17 C.F.R. § 240.10b-5(b).  To state a claim that Defendants made material misrepresentations or

7    omissions in violation of § 10(b) and Rule 10b-5, Plaintiffs must allege sufficient facts showing:

8    "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

9    between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon

10   the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives,*

11   *Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011) (citing *Stoneridge Inv. Partners, LLC v. Scientific-*

12   *Atlanta, Inc.*, 552 U.S. 148, 157 (2008)); *see also In re Gilead Scis.*, 536 F.3d at 1055 (identifying

13   the five elements of a Rule 10b-5 claim as: "(1) a material misrepresentation or omission of fact;

14   (2) scienter; (3) a connection with the purchase or sale of a security; (4) transaction and loss

15   causation; and (5) economic loss").

### 1.    Misrepresentation or Omission of a Material Fact

17        In the securities fraud context, a statement or omission is misleading "if it would give a

18   reasonable investor the 'impression of a state of affairs that differs in a material way from the one

19   that actually exists.'"  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)

20   (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).  To satisfy the

21   materiality requirement, a plaintiff must allege a statement or omission that a reasonable investor

22   would have considered significant in making investment decisions.  *See Basic v. Levinson*, 485

23   U.S. 224, 231-32 (1988) (adopting the standard in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S.

24   438, 449 (1976), for § 10(b) and Rule 10b-5 actions).  Similarly, an omission is material if there is

25   a substantial likelihood that the "disclosure of the omitted fact would have been viewed by the

26   reasonable investor as having significantly altered the 'total mix' of the information made

27   available."  *TSC Indus.*, 426 U.S. at 449.  Materiality is a mixed question of law and fact.  *See id.* at

28   450.

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

1    Plaintiffs here allege that Juniper made: (1) false or misleading statements regarding

2  Juniper's future prospects; and (2) deficient disclosures regarding the impact of Juniper's adoption

3  of the new revenue recognition accounting rules.  The Court addresses these allegations in turn.

### a.  Future Business Prospects

5    In the Amended Complaint, Plaintiffs identify a number of statements, mostly on investor

6  conference calls, that concern Defendants' projections of future revenues or perspectives on the

7  outlook of future business prospects.  In these statements, Defendants Johnson and Delholm

8  relayed Juniper's expectations with respect to revenue growth, operating margin growth, and

9  general financial outlook for much of FY10 and FY11.  Plaintiffs allege that Defendants' repeated

10  assertions that Juniper would achieve 20+% yearly revenue growth and 25+% yearly margin

11  growth were misleading in light of their failure to disclose that (1) Juniper could not achieve its

12  earnings targets in the absence of the temporary earning bump created by the change in accounting

13  rules, and (2) Juniper was facing a downturn in its business that made its earnings targets

14  unachievable.  The Court agrees with Defendants that all of the accused statements concerning

15  long-term revenue projections are either: (1) protected by the PSLRA Safe Harbor; (2) mere

16  expressions of corporate optimism and thus unactionable; or (3) not adequately pled as false or

17  misleading.

18    _Safe Harbor._  Under the PSLRA "Safe Harbor" Provision, "forward-looking statements"

19  are not actionable as a matter of law if they are identified as such and accompanied by "meaningful

20  cautionary statements identifying important factors that could cause actual results to differ

21  materially from those in the forward looking statement."  _See_ 15 U.S.C. § 78u-5(c)(1)(A)(i).  A

22  forward looking statement is "any statement regarding (1) financial projections, (2) plans and

23  objectives of management for future operations, (3) future economic performance, or (4) the

24  assumptions 'underlying or related to' any of these issues."  _No. 84 Employer-Teamster Joint_

25  _Council Pension Trust Fund v. Am. W. Holding Corp._, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15

26  U.S.C. § 78u-5(i)).[4]  "[I]f a forward-looking statement is identified as such and accompanied by

27

28  _____

[4] The PSLRA defines "forward-looking statement" as:

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

1    meaningful cautionary statements, then the state of mind of the individual making the statement is

2    irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *In*

3    *re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

4         As Defendants argue, and Plaintiffs do not contest, all of the statements regarding Juniper's

5    revenue guidance and sales forecast are prototypical examples of "forward-looking statements."

6    *See, e.g.*, *In re Accuray Sec. Litig.*, 757 F. Supp. 2d 936, 946 (N.D. Cal. 2010) ("A forward-looking

7    statement is 'a statement containing a projection of revenues, income (including income loss),

8    earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or

9    other financial items.'" (citing 15 U.S.C. § 78u-5(i)(1)(A)); *see also In re LeapFrog Enters., Inc.*

10   *Sec. Litig.*, 527 F. Supp. 2d 1033, 1046 (N.D. Cal. 2007) ("Here, each of the financial forecast

11   statements identified by defendants as forward-looking falls squarely within 15 U.S.C. § 78u-

12   5(i)(1)(A)-(D) as each is a statement predicting the company's future expected sales or other

13   financial results."). The forward-looking statements were also identified as such by Juniper. *See,*

14   *e.g.*, Ostler Decl. Ex. 17 at 2 ("In today's call, [Ms. Denholm] will also be providing forward-

15   looking guidance. . . . All guidance is forward-looking[.]").

16       Plaintiffs contend, however, that Defendants failed to provide "meaningful cautionary

17   statements identifying important factors that could cause actual results to differ materially from

18   those in the forward-looking statement," as required for Safe Harbor protection under subsection

19   (A)(i). The Court disagrees. A representative of Juniper began all of the conference calls at issue

20

21       (A) a statement containing a projection of revenues, income (including income
         loss), earnings (including earnings loss) per share, capital expenditures, dividends,
22       capital structure, or other financial items; (B) a statement of the plans and objectives
         of management for future operations, including plans or objectives relating to the
23       products or services of the issuer; (C) a statement of future economic performance,
         including any such statement contained in a discussion and analysis of financial
24       condition by the management or in the results of operations included pursuant to the
         rules and regulations of the Commission; (D) any statement of the assumptions
25       underlying or relating to any statement described in subparagraph (A), (B), or (C);
         (E) any report issued by an outside reviewer retained by an issuer, to the extent that
26       the report assesses a forward-looking statement made by the issuer; or (F) a
         statement containing a projection or estimate of such other items as may be
27       specified by rule or regulation of the Commission.

28   15 U.S.C. § 78u-5(i)(1).

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

1   with a notice that the opinions and statements regarding revenue guidance were forward-looking

2   and that actual results could vary based on risks and uncertainties identified in Juniper's filings

3   with the SEC.  *See, e.g.*, Ostler Decl. Ex. 17 [2Q2010 earnings call] at 2; *id.* Ex. 18 [3Q2010

4   earnings call] at 2; *id.* Ex. 19 [4Q2010 earnings call] at 2.  This accompanying cautionary language

5   is not materially different from the cautionary language held sufficient by the Ninth Circuit in *In re*

6   *Cutera*.  *See* 610 F.3d at 1112 (defendant properly identified statements as forward-looking by

7   beginning an analyst call with a notice that "these prepared remarks contain forward-looking

8   statements concerning future financial performance and guidance,' that 'management may make

9   additional forward-looking statements in response to[ ] questions,' and that factors like Cutera's

10  'ability to continue increasing sales performance worldwide' could cause variance in the results").

11  Moreover, Juniper's SEC filings detailed a number of risk factors including warnings of

12  "[f]luctuating economic conditions [that] make it difficult to predict revenues for a particular

13  period"; "intense competition that could reduce [Juniper's] revenues and adversely affect [its]

14  financial results"; the possibility that "recent level of product gross margin may not be

15  sustainable"; the risk that Juniper's "ability to develop, market, and sell products could be harmed

16  if [it is] unable to retain or hire key personnel"; "undetected errors" in Juniper's technical products;

17  and interoperability issues between Juniper's products and its customers' hardware and software.

18  *See, e.g.*, Ex. 46 [3Q10 Form 10-Q].

19         Moreover, even if a forward-looking statement is not identified as such or is

20  unaccompanied by meaningful cautionary statements, the statement is actionable only if the

21  plaintiff proves that the forward-looking statement "was made with actual knowledge by that

22  person that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B)(i); *see Provenz v.*

23  *Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996).  That is, a forward-looking statement falling outside

24  the scope of § 78u-5(c)(1)(A) is actionable if "either '(1) the statement [was] not actually believed

25  [by the speaker], (2) there [was] no reasonable basis for the belief, or (3) the speaker [was] aware

26  of undisclosed facts tending to seriously undermine the statement's accuracy.'"  *In re Oracle Corp.*

27  *Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010) (emphasis omitted) (quoting *Provenz v. Miller*, 102

28  F.3d 1478, 1487 (9th Cir. 1996)).  For the reasons discussed below in the Court's analysis of

19

United States District Court
For the Northern District of California

1   scienter, Plaintiffs have not adequately pled that Defendants had actual knowledge that their

2   forward-looking projections were false or misleading when made.  Accordingly, even if Plaintiffs

3   were correct – and they are not – that the forward-looking statements are not accompanied by

4   meaningful cautionary language, these statements are still protected by the PSLRA Safe Harbor

5   and thus cannot support a securities fraud claim under § 10(b).

6          *Corporate Optimism*.  Defendants argue that, to the extent any statements regarding

7   Juniper's future business prospects also discuss Juniper's past or current situation, such statements

8   are not actionable under the PSLRA because they are merely vague and amorphous statements of

9   corporate optimism.  For instance, Defendant argues that statements asserting that "[a]ll of

10  [Juniper's] underlying demand metrics were strong" or that Juniper has "good underlying market

11  fundamentals, a strong balance sheet, and a solid operating model" are nothing more than

12  statements of corporate optimism.

13         The Court again agrees with Defendants.  In the Ninth Circuit, "vague, generalized

14  assertions of corporate optimism or statements of 'mere puffing' are not actionable material

15  misrepresentations under federal securities laws" because no reasonable investor would rely on

16  such statements.  *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D.

17  Cal. 2008) (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003));

18  *see In re Cutera*, 610 F.3d at 1111 ("[P]rofessional investors, and most amateur investors as well,

19  know how to devalue the optimism of corporate executives.").  "When valuing corporations, . . .

20  investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel

21  good monikers."  *In re Cutera*, 610 F.3d at 1111.  Thus, for example, a court has held unactionable

22  as "mere puffery" statements that "[w]e are very pleased with the learning from our pilot launch,"

23  "so far we're getting really great feedback," and "we are very pleased with our progress to date."

24  *Wozniak v. Align Tech., Inc.*, No. C 09-3671 MMC, 2012 WL 368366, at *4-5 (N.D. Cal. Feb. 3,

25  2012).  Likewise, "statements projecting 'excellent results,' a 'blowout winner' product,

26  'significant sales gains,' and '10% to 30% growth rate over the next several years'" have been held

27  unactionable as mere puffery.  *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp.

28  2d 1069, 1087 (N.D. Cal. 2005); *see also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857,

868-69 (N.D. Cal. 2004) ("run-of-the-mill" statements such as "business remained strong" are not actionable under § 10(b)); *In re LeapFrog*, 527 F. Supp. 2d at 1050 (vague and amorphous statements such as "This is going to be a very big second half for us;" "Our underlying sell-through at the retail level remained very strong throughout the third quarter;" "[C]onsumer demand for our learning products is more vibrant than ever;" and "We are pleased with our progress," were unactionable under § 10(b)).

To the extent Plaintiffs challenge statements in which Defendants merely express confidence in Juniper's business and outlook, such statements are simply vague assertions of corporate optimism and therefore are not actionable under the federal securities laws. *See, e.g.*, AC ¶ 73 ("Both Verizon and AT&T are strong partners"); *id.* ¶ 87 (we have "strong demand metrics and good momentum"); *id.* ¶ 91 ("our demand indicators are strong, our product portfolio is robust"); *id.* ¶ 123 ("growth drivers give us . . . confidence").

<u>Not False or Misleading</u>.  Finally, Safe Harbor and corporate optimism protection aside, Plaintiffs fail to adequately plead that Juniper's long term projections were false or misleading when made.  Plaintiffs allege that Juniper's long term projections were false because various business problems and difficulties rendered unattainable the Company's 20+% yearly revenue growth and 25+% yearly operating margin growth forecasts.  *See* AC ¶¶ 30-43.  Beyond merely making conclusory allegations, however, Plaintiffs were "required to allege specific facts that show how these 'problems' and 'difficulties'" necessarily precluded Juniper from reaching its projected growth targets.  *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001).  Plaintiffs attempt to show falsehood through the use of five confidential witnesses, but their allegations fall short.

CW1, for instance, reported that Juniper lacked the trained sales personnel required to sell its MX routers in the volumes required to meet the company's goals and that slumping sales at IBM, a major Enterprise customer, resulted in decreased sales for Juniper.  AC ¶¶ 31-32.  Plaintiffs, however, fail to allege facts that explain how these setbacks necessarily preclude the financial projections published by Defendants.  Indeed, the Amended Complaint alleges neither how far MX router sales were below the company's goals nor how important the MX router sales were to Juniper's overall revenue.  Similarly, CW2 reported that sales to Enterprise customers were down,

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

1    that he and his colleagues had trouble meeting sales goals, that key SRX Series products had

2    compatibility issues with the JUNOS operating system, and that the "Intrusion, Detection and

3    Prevention" ("IDP") component of the SRX system suffered from bugs causing it to be rejected by

4    IBM. AC ¶¶ 33-35. Again, however, Plaintiffs fail to allege facts that provide an analytical link

5    between the particular facts supplied by the confidential witness and the ultimate conclusion that

6    Juniper could not meet its overall revenue and growth goals. Indeed, Plaintiffs do not even allege

7    that CW2 and his colleagues failed to meet their sales goals—only that they "struggled" to meet

8    their goals.

9         CW3 offered only a very brief report that the SRX products suffered setbacks and that

10   Verizon and Sprint grew frustrated that SRX could only be implemented in certain parts of the

11   telecom infrastructure. AC ¶ 36. As with the other confidential witnesses, Plaintiff fails to supply

12   any additional allegations that explain how CW3's report precluded Juniper's financial projections.

13   CW4 added more general allegations of "slumping sales," "intense pricing pressure," and difficulty

14   selling to service providers, in part as a result of bugs in the JUNOS operating system. AC ¶¶ 37,

15   41-42. As above, Plaintiffs failed to augment these with the necessary factual allegations to

16   demonstrate the falsity of Juniper's financial projections. However, CW4 also reported that she

17   created executive reports that provided an overview of Juniper's performance and outlook that

18   were reviewed and discussed at weekly meetings attended by senior management. *Id.* ¶¶ 37-38.

19   According to CW4, attendees at her executive meetings regularly expressed concern about sales

20   performance and pricing pressure during 3Q10. *Id.* ¶ 40. Nevertheless, CW4 never alleges that

21   anyone at any of her weekly meetings ever believed any of the problems alleged by Plaintiff to be

22   so severe that it would prevent Juniper from meeting its long term goals.

23        Plaintiffs' final confidential witness, CW5, merely alleges that his group made it known that

24   they could not achieve a 20% growth in revenue in 2011 and that all six territories of Verizon

25   channel sales were at less than 50% of their quarterly 2011 targets. *Id.* ¶ 43. CW5's reports suffer

26   from many of the same problems as previous confidential witness reports, namely that Plaintiffs

27   fail to allege facts explaining how the performance of either CW5's group or the Verizon sales

28   impacted the revenues of Juniper as a whole.

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

1    In sum, Plaintiffs' allegations fail to show that Defendants' long-term projections were false

2    or misleading when made.  Nor have Plaintiffs alleged facts showing "a substantial likelihood that

3    the "disclosure of the omitted fact would have been viewed by the reasonable investor as having

4    significantly altered the 'total mix' of the information made available." *TSC Indus.*, 426 U.S. at

5    449.  Accordingly, Defendants' motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims

6    based on these statements is GRANTED with leave to amend.

### b.  New Accounting Rules

8    Plaintiffs also allege that Juniper "buried" its disclosures regarding Juniper's adoption of

9    the new revenue recognition rules and the impact that the change in the rules had on Juniper's

10   financial statements.  Granted, "[i]f '[p]roperly pled, overstating of revenues may state a claim for

11   securities fraud, as under GAAP, revenue must be earned before it can be recognized." *In re Daou*,

12   411 F.3d at 1016 (quoting *Hockey v. Medhekar*, 30 F. Supp. 2d 1209, 1216 (N.D. Cal. 1998)

13   (quoting *Provenz*, 102 F.3d at 1484)).  Here, however, Plaintiffs do not even allege that Defendants

14   violated GAAP standards or that their financial statements were false.  Rather, Plaintiffs allege that

15   Defendants failed to adequately disclose the impact of their early adoption of the new accounting

16   practices, and that Defendants' inadequate disclosures misled investors into thinking reported

17   revenues were higher than they actually were.

18   Defendants argue that none of the SEC disclosures identified by Plaintiffs constitute

19   materially misleading statements because they comport with revenue reporting and disclosure

20   requirements published by the FASB, and Juniper had no duty to disclose the additional details to

21   which Plaintiffs believe they were entitled.  Indeed, Defendants contend that Juniper's 10-K and

22   10-Q Form filings fully disclose the impact of the adoption of ASU 2009-13 and ASU 2009-14 on

23   the Company's reported earnings.  In particular, Defendants argue that their SEC disclosures made

24   clear that: (1) Juniper recognized revenue under the new rules that would have been deferred under

25   the old rules; (2) Juniper continued to recognize revenue from its deferred revenue balances; and

26   (3) Juniper expected its deferred revenue balances to decrease over time.  *See, e.g.*, Ostler Decl. Ex.

27   3 [1Q10 Form 10-Q] at 6-8, 36-37; *id.* Ex. 5 [2Q10 Form 10-Q] at 6-8, 21, 44-45, 59-60, 70; *id.*

28   Ex. 8 [ 3Q10 Form 10-0Q] at 6-8, 40-42.  Furthermore, Defendants point out that these SEC filings

23

disclosed exactly how much larger Juniper's reported revenues were under the new accounting practices as compared to the old practices, in conformity with Example 1 of the FASB's disclosure reporting guidelines. Accordingly, Defendants argue that their disclosures were in compliance with the FASB accounting rules and thus did not constitute misleading statements.

The Court agrees with Defendants that Plaintiffs have not pled sufficient facts to show that Defendants' disclosures were materially misleading statements under the federal securities laws. Plaintiffs concede that Juniper made various disclosures throughout the Class Period regarding its adoption of the new accounting rules and the impact of the new rules on Juniper's financial results, and that Juniper's disclosure conformed to Example 1 in the FASB's disclosure guidelines. Plaintiffs merely object to the specificity and comprehensiveness of Juniper's various disclosures, insisting that Defendants' disclosure under Example 1 was insufficient and that Defendants should have made a more fulsome disclosure as set forth in Example 3 of the FASB guidelines.[5] But it is well established that the PSLRA does not impose a duty of completeness. As the Supreme Court has recently reaffirmed, "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives*, 131 S. Ct. at 1321. In general, companies have no duty to disclose facts, and must do so only "when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(b)). "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic*, 485 U.S. at 231-32 (quoting *TSC Indus*, 426 U.S. at 449).

Here, Plaintiffs have not pled sufficient facts to demonstrate that disclosure of the omitted information would have significantly altered the "total mix" of information available to investors. *TSC Indus.*, 426 U.S. at 449. Plaintiffs have likewise failed to plead facts showing that Defendants had an affirmative duty to provide further disclosures beyond what was already included in

---

[5] Example 3 required disclosure of: (1) revenue recognized in the current period both from arrangements entered into before the year of change (under the old rules) and arrangements entered into or modified during the year of change (under the new rules); and (2) deferred revenue for each type of arrangement as of the end of the current reporting period.

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

1    Juniper's SEC filings.  Accordingly, Plaintiffs have so far failed to plead sufficient facts to

2    demonstrate that Defendant's accounting rule disclosures were inadequate under *Matrixx*.[6]

3            In summary, Plaintiffs' Amended Complaint fails to adequately allege a misrepresentation

4    or omission of a material fact, and thus fails to state a claim under § 10(b) of the Exchange Act.

5    Accordingly, Defendants' motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims based

6    on these statements is GRANTED with leave to amend.

                                    **2.  Scienter**

8            Defendants also move to dismiss Plaintiffs' claims for insufficient allegations of scienter.

9    To state a claim for securities fraud under the PSLRA, a complaint must "state with particularity

10   facts giving rise to a strong inference that the defendant acted with the required state of mind."  15

11   U.S.C. § 78u-4(b)(2)(A).  "Thus, the complaint must allege that the defendants made false or

12   misleading statements either intentionally or with deliberate recklessness."  *In re Daou*, 411 F.3d at

13   1015 (citing *In re Silicon Graphics*, 183 F.3d at 974); *see Matrixx Initiatives*, 131 S. Ct. at 1323-24

14   (assuming, without deciding, the correctness of the Ninth Circuit's holding that "deliberate

15   recklessness" is sufficient to establish scienter).  Within the context of § 10(b) claims, the Ninth

16   Circuit defines "recklessness" as "a highly unreasonable omission [or misrepresentation], involving

17   not merely simple, or even inexcusable negligence, but an extreme departure from the standards of

18   ordinary care, and which presents a danger of misleading buyers or sellers that is either known to

19   the defendant or is so obvious that the actor must have been aware of it."  *Hollinger v. Titan Cap.*

20   *Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (quoting *Sundstrand Corp. v. Sun Chem.*

21   ─────────────
     [6] Though not necessary to the Court's ruling, the Court briefly addresses Plaintiffs' argument that
22   Defendants' motion to dismiss amounts to nothing more than a "truth-on-the-market" defense.
     Such a defense applies where "a defendant's failure to disclose material information may be
23   excused where the information was made credibly available to the market by other sources."
     *Nguyen v. Radient Pharm. Corp.*, No. SACV11-0406, 2011 WL 5041959, at *6 (C.D. Cal. Oct. 20,
24   2011) (citing *In re Amgen, Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008)).  Plaintiffs
     contend that Defendants' motion must be denied because "a 'truth-on-the-market' defense is
25   available in principle . . . but not at the pleading stage," *In re Thoratec Corp. Securities Litigation*,
     2006 WL 1305226, at *4 (N.D. Cal. May 11, 2006) (quoting *Asher v. Baxter Int'l Inc.*, 377 F.3d
26   727, 734 (7th Cir. 2004)).  Plaintiffs' "truth-on-the-market" arguments, however, are inapposite.
     Defendants argue that they disclosed all required information, not that they failed to make required
27   disclosures but should be excused because other sources have already made the same information
     available.
28

                                    25
     Case No.: 5:11-CV-04003-LHK
     ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

*Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)); *see also In re Silicon Graphics*, 183 F.3d at 976-77 (explaining that recklessness, as defined by *Hollinger*, is a form of intentional conduct, not merely an extreme form of negligence).  That is to say, although actual knowledge or intent to defraud is not required, allegations of reckless conduct must "'reflect[] some degree of intentional or conscious misconduct.'"  *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (quoting *In re Silicon Graphics*, 183 F.3d at 977).  To be "strong," "[t]he inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations."  *Tellabs*, 551 U.S. at 324.  A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324; *accord Matrixx Initiatives*, 131 S. Ct. at 1324.

Plaintiffs' scienter allegations rely on (1) a core operations theory, and (2) evidence of Individual Defendants' financial motive and opportunity to defraud investors.  In evaluating the sufficiency of Plaintiffs' allegations, the Court first determines "whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter."  *Zucco Partners*, 552 F.3d at 992.  "[I]f no individual allegations are sufficient, [the Court] will conduct a 'holistic' review of the same allegations," *id.*, viewing the totality of the circumstances pled, and consider whether they create an inference of scienter "at least as compelling as an alternative innocent explanation," *id.* at 1006.  *See Tellabs*, 551 U.S. at 325 ("When evaluating the strength of an inference, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").

First, Plaintiffs argue that because the Individual Defendants held central corporate roles, the Court can infer under a core operations theory that the Individual Defendants had intimate and up-to-date knowledge about Juniper's inner workings.  *See* AC ¶¶ 21-24, 164.  The core operations theory on which Defendants rely is used to impute to a company's key officers knowledge of "facts critical to a business's 'core operations' or an important transaction."  *South Ferry*, 542 F.3d at 783.  Plaintiffs argue that because the Individual Defendants were core corporate officers, they must have known about the effect of the new accounting practices and moreover that the long-term

26

United States District Court
For the Northern District of California

1   financial projections were unrealistic and unattainable.  Plaintiffs argue, accordingly, that there is a

2   strong inference that Defendants possessed the required scienter when making the allegedly

3   misleading statements.

4         The Court is not persuaded.  The core operations theory allows a court, in limited

5   circumstances, to infer scienter of undisclosed information because "it would be absurd to suggest

6   that top management was unaware of them."  *Berson v. Applied Signal Tech.*, 527 F.3d 982, 987,

7   989 (9th Cir. 2008) (finding plaintiffs had sufficiently plead scienter by alleging "that these high-

8   level managers must have known about the orders because of their devastating effect on the

9   corporation's revenue. . . . These facts were prominent enough that it would be 'absurd to suggest'

10  that top management was unaware of them.").  There is no dispute here that Defendants knew

11  about the new accounting practices, given that Defendants actually disclosed the Company's

12  adoption of the new rules and their financial impact on the Company.  Thus, the core operations

13  theory is simply inapplicable to Plaintiffs' claims based on allegedly deficient disclosures of

14  Juniper's new accounting practices.[7]

15        As for Defendants' putative omissions implicating its long-term business prospects,

16  Plaintiffs have not adequately pled that Defendants' long-term projections were actually false or

17  misleading.  Thus, it follows that Plaintiffs have not adequately pled facts from which one can infer

18  that Defendants knew their statements to be false or misleading.  Moreover, Plaintiffs have not pled

19  that this is the "exceedingly rare" case in which a securities fraud plaintiff may rely solely on the

20  core operations inference without particularized allegations about each defendant's access to the

21  relevant information.  *See South Ferry*, 542 F.3d at 785 n.3 (discussing *Berson*, 527 F.3d at 982-

22  88).  Nor have Plaintiffs pled "detailed and specific allegations about management's exposure to

23  factual information within the company."  *Id.* at 785; *see In re Daou*, 411 F.3d at 1022-23

24  ("specific admissions from top executives that they are involved in every detail of the company and

---

[7] Plaintiffs have also failed to plead facts demonstrating that Defendants acted recklessly in
disregarding the risk that their statements and omissions concerning the impact of the accounting
rules on Juniper's revenue would mislead investors.  As stated above, Juniper's disclosures with the
SEC track one of the sample disclosures given in the ASU 2009-13 and ASU 2009-14 rules.  While
Plaintiffs argue that Defendants should have disclosed more, their arguments are unsupported by
allegations demonstrating actual deliberate recklessness.

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

1    that they monitored portions of the company's database" supported strong inference of scienter);

2    *Nursing Home Pension Fund*, 380 F.3d at 1231 ("hard numbers" and specific admissions by the

3    CEO regarding knowledge of large portions of the company's data supported a strong inference of

4    scienter); *but see Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (generalized

5    allegations that defendant corporation "could regularly track its sales data" insufficient to support

6    strong inference of scienter).  Plaintiffs' allegations here come nowhere close to identifying "hard

7    numbers" or specific admissions of Defendants that they knew of the allegedly undisclosed

8    information, such as Juniper's slumping sales and product compatibility issues.  Accordingly,

9    Plaintiffs' core operations theory fails to show that Defendants had actual knowledge that their

10   future projections were false at the time they made them and thus fails to establish scienter as

11   required under the PSLRA.

12          As additional evidence of scienter, Plaintiffs point to Individual Defendants' sales of

13   Juniper stock during the Class Period.  In particular, Plaintiffs allege that all three Individual

14   Defendants engaged in stock sales that were suspicious, unusual, and inconsistent with prior sales.

15   The Ninth Circuit has instructed that "a strong inference of fraudulent intent may occur when an

16   insider 'owning much of a company's stock make[s] rosy characterizations of company

17   performance to the market while simultaneously' selling large percentages of his holdings."

18   *Lipton*, 284 F.3d at 1036-37 (quoting *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001)).

19   Generally, however, insider stock sales are suspicious "only when the level of trading is

20   dramatically out of line with prior trading practices at times calculated to maximize the personal

21   benefit from undisclosed inside information."  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092

22   (9th Cir. 2002) (internal quotation marks and citation omitted), *abrogated on other grounds by*

23   *Tellabs*, 551 U.S. 308, *as recognized in South Ferry*, 542 F.3d at 784.  "To evaluate suspiciousness

24   of stock sales, [the Court] consider[s], *inter alia*, three factors: (1) the amount and percentage of

25   shares sold; (2) timing of the sales; and (3) consistency with prior trading history."  *Nursing Home*

26   *Pension Fund*, 380 F.3d at 1232 (quoting *In re Silicon Graphics*, 183 F.3d at 986).

27          Here, the allegations concerning the Individual Defendants' stock sales from 2009-2011 do

28   not support a strong inference of scienter.  Defendant Johnson made only one sale during the entire

28

**United States District Court**
For the Northern District of California

1  Class Period – a sale of 32,000 shares on November 8, 2010 – that constituted a mere 2% of his

2  total holdings.  AC ¶ 167; *see* Ostler Decl. Ex. 1 at 31-32, Ex. 11 at 39.  Meanwhile, all of the sales

3  by Defendant Denholm during the Class Period were non-discretionary sales made pursuant to a

4  Rule 10b5-1 trading plan, which Denholm created prior to the Class Period.  *See* Ostler Decl. Exs.

5  38a-h.  This innocent, alternative explanation for the stock sales negates an inference of scienter.

6  *See Metzler*, 540 U.S. at 1067 n.11.  Finally, while Plaintiffs have alleged that Kriens sold an

7  unusually large portion of his stock holdings during the Class Period, an allegation that only one

8  Defendant displayed unusual stock trades during the Class Period is insufficient to support a strong

9  inference of scienter absent some corroborating evidence.

10       Moreover, "[w]hile it is true that motive can be a relevant consideration, and personal

11  financial gain may weigh heavily in favor of a scienter inference, . . . allegations must be

12  considered collectively; the significance that can be ascribed to an allegation of motive, or lack

13  thereof, depends on the entirety of the complaint."  *Tellabs*, 551 U.S. at 325.  Indeed, Ninth Circuit

14  case law makes clear that such "motive and opportunity" evidence alone is insufficient to establish

15  scienter at the pleadings stage.  *Lipton*, 284 F.3d at 1035, 1038.  In fact, *Howard v. Everex Sys.*, 228

16  F.3d 1057, 1065 (9th Cir. 2000) (citing *In re Silicon Graphics*, 183 F.3d at 977-79), cited by

17  Plaintiffs for the proposition that such evidence would be sufficient, explicitly noted that "motive

18  and opportunity alone are insufficient to show scienter at the pleading stage."

19       Taken as a whole, the facts alleged by Plaintiffs fail to give rise to a strong inference of

20  scienter in light of competing innocent inferences.  The PSLRA requires that "an inference of

21  scienter must be more than merely plausible or reasonable—it must be cogent and at least as

22  compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  While

23  Plaintiffs have alleged facts that do give rise to *an* inference of scienter, such an inference is not as

24  compelling as competing innocent inferences.  Indeed, the facts as pled by Plaintiff just as easily

25  support an inference that the Individual Defendants genuinely believed that Juniper would be able

26  to meet its long term projections.  Similarly, the Amended Complaint's allegations also support an

27  inference that any problems with Juniper's products or sales force were already accounted for in its

28  stock price.  *See* AC ¶ 187 ("At all relevant times, the market for Juniper's common stock was an

29

efficient market."). Plaintiffs' allegations do not create a strong inference that either the Company or the Individual Defendants acted with deliberate recklessness or engaged in conscious misconduct, in light of competing innocent inferences. Accordingly, not only have Plaintiffs failed to plead a material misrepresentation or omission, but they have also failed to plead facts giving rise to a strong inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. For this reason, too, Defendants' motions to dismiss the § 10(b) claims are GRANTED with leave to amend.

### B. Section 20(a) and 20A of the Exchange Act

Congress has also established liability in § 20(a) for "[e]very person who, directly or indirectly, controls any person liable" for violations of the securities laws. 15 U.S.C. § 78t(a). Section 20A creates liability for "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information." 15 U.S.C. § 78t-1. To prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law;" and (2) "that the defendant exercised actual power or control over the primary violator." *See Howard*, 228 F.3d at 1065. Similarly, an insider may be liable under § 20A only upon proof of an independent violation of the securities laws. *See Lipton*, 284 F.3d at 1035 n.15; *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993). Because Plaintiffs have failed to plead a primary securities law violation, Plaintiffs have also failed to plead a violation of Section 20(a) or of Section 20A. *See In re Cutera*, 610 F.3d at 1113 n.6; *Lipton*, 284 F.3d at 1035 n.15. Accordingly, Defendants' motion to dismiss the claims under Sections 20(a) and 20A is also GRANTED with leave to amend.

### V.   KRIENS' MOTION TO DISMISS

Defendant Kriens moves separately to dismiss Plaintiffs' claims against him. The reasons for dismissal discussed above apply equally to Kriens, and thus Kriens' motion to dismiss is likewise GRANTED with leave to amend. In light of the leave to amend, however, the Court briefly addresses the additional argument raised in Kriens' motion that are specific to Kriens alone, namely that Kriens cannot be liable under the facts as pled for any of the accused statements made

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1 | by other Individual Defendants regarding Juniper's long-term growth prospects because Kriens did

2 | not "make" any of those statements.

3 |       A defendant can be held liable under § 10(b) for a false or misleading statement only if the

4 | defendant "made" the statement.  The Supreme Court has recently clarified that, "[f]or purposes of

5 | Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the

6 | statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v.*

7 | *First Deriv. Traders*, 131 S. Ct. 2296, 2302 (2011).  Kriens concedes that he, as Chairman of the

8 | Board and a signatory on certain SEC filings, has "ultimate authority" over statements filed with

9 | the SEC regarding Juniper's adoption of the new accounting practices.  Kriens argues, however,

10 | that he cannot be liable under the facts as pled for any of the allegations relating to the other

11 | Individual Defendants' allegedly misleading statements about Juniper's long-term growth

12 | prospects.

13 |       The Court agrees with Kriens.  Nowhere in the Amended Complaint do Plaintiffs allege

14 | facts demonstrating that Kriens had "ultimate authority" over the statements made by Johnson or

15 | Denholm during the analyst or investor calls.  The casual chain between the facts alleged here and

16 | the conclusory statement that "Kriens was one of the persons at Juniper with the 'ultimate

17 | authority'" is too attenuated to survive a motion to dismiss.  Indeed, Plaintiffs' complaint contains

18 | little more than "bare assertions" that "amount to nothing more than a 'formulaic recitation of the

19 | elements' of a claim.'" *Iqbal*, 129 S. Ct. at 1951.  To survive a motion to dismiss, Plaintiffs must

20 | allege "more than labels and conclusions." *Twombly*, 550 U.S. at 555.  The only Statements for

21 | which Plaintiffs have satisfied this burden are Juniper's 10-K form filed with the SEC on February

22 | 25, 2011, and Juniper's Shelf Registration Statement filed on August 10, 2010 (which in turn

23 | "incorporated by reference" other SEC filings), both of which were signed by Kriens.  Accordingly,

24 | dismissal of Plaintiff's claims against Kriens for all statements not made in SEC filings is also

25 | granted on this additional ground.

26 | **VI.   CONCLUSION**

27 |       For the foregoing reasons, Defendants Juniper Networks', Johnson's, and Denholm's

28 | Motion to Dismiss is GRANTED.  Defendant Kriens' motion to dismiss is also GRANTED.

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 . . . to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and alterations omitted). Because it is not clear that amendment would necessarily be futile, cause undue delay, or prejudice Defendants, the Court grants Plaintiffs leave to amend. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008). Any amended complaint must be filed and served within twenty-one days of the date of this Order. Plaintiff may not add new causes of action or parties absent leave of the Court or the parties' stipulation. *See* Fed. R. Civ. P. 15. Failure to cure the deficiencies identified herein will result in dismissal with prejudice.

**IT IS SO ORDERED.**

Dated: July 23, 2012

_Lucy H. Koh_

LUCY H. KOH
United States District Judge

Case No.: 5:11-CV-04003-LHK
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California