1   NINA F. LOCKER, State Bar No. 123838
    nlocker@wsgr.com
2   STEVEN GUGGENHEIM, State Bar No. 201386
    sguggenheim@wsgr.com
3   JONI OSTLER, State Bar No. 230009
    jostler@wsgr.com
4   JESSICA L. SNORGRASS, State Bar No. 259962
    jsnorgrass@wsgr.com
5   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
6   650 Page Mill Road
    Palo Alto, CA 94304-1050
7   Telephone:  (650) 493-9300
    Facsimile:   (650) 565-5100
8

9   Attorneys for Defendants
    Juniper Networks, Inc., Kevin R. Johnson,
10  Robyn M. Denholm, and Scott G. Kriens

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13  CITY OF OMAHA POLICE AND FIRE          )   CASE NO.:  11-cv-4003 LHK
    RETIREMENT SYSTEM and CITY OF          )   CLASS ACTION
14  BRISTOL PENSION FUND, Individually and on )
    Behalf of All Others Similarly Situated,  )
15                                          )   **DEFENDANTS' NOTICE OF**
                   Plaintiffs,              )   **MOTION AND MOTION TO**
16                                          )   **DISMISS SECOND AMENDED**
           v.                               )   **COMPLAINT FOR VIOLATION OF**
17                                          )   **THE FEDERAL SECURITIES**
    JUNIPER NETWORKS, INC., SCOTT G.        )   **LAWS**
18  KRIENS, KEVIN R. JOHNSON, and ROBYN     )
    M. DENHOLM,                             )   Date:   January 31, 2013
19                                          )   Time:   1:30 p.m.
                   Defendants.              )   Dept:   8, 4th Floor
20                                          )
                                            )   Before:  Honorable Lucy H. Koh
21                                          )
                                            )
22  _____ )

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ...................................................................................1

STATEMENT OF ISSUES (CIVIL L.R. 7-4(A)(3)).............................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................1

INTRODUCTION....................................................................................................................1

BACKGROUND.......................................................................................................................3

    The Parties ...................................................................................................................3

    The Claims ...................................................................................................................4

    FASB's Change in Accounting Rules ........................................................................4

    Juniper's Disclosures Regarding the Change in Accounting Rules ...........................5

    The FASB Requirements .............................................................................................5

    Disclosure Beyond The FASB Requirements ............................................................7

    Juniper's Long Term Projections ...............................................................................8

    The Court's Order Dismissing Plaintiffs' First Amended Complaint.........................8

    The Second Amended Complaint ..............................................................................10

ARGUMENT ..........................................................................................................................11

I.     PLAINTIFFS' COMPLAINT IS SUBJECT TO STRICT PLEADING
       STANDARDS ...............................................................................................11

II.    PLAINTIFFS STILL FAIL TO ALLEGE AN ACTIONABLE FALSE OR
       MISLEADING STATEMENT ......................................................................12

    A.    Plaintiffs' Claim Based Upon Juniper's Long Term Projections Must Be
        Dismissed ......................................................................................................12

    B.    Plaintiffs Fail To Allege Any False Or Misleading Statement Regarding
        The New Accounting Rules ...........................................................................15

        1.    Plaintiffs Fail to Allege That Juniper's Disclosures Violated FASB's
           Guidelines.........................................................................................15

           a.    Mr. Harden's Declaration Should Not Be Considered.................15

           b.    Plaintiffs and Mr. Harden Fail to Explain Why Any
               Additional Disclosures Were Needed to Satisfy FASB ...............16

III.      PLAINTIFFS FAIL TO ALLEGE A "STRONG INFERENCE" OF SCIENTER ..........21

          A.      CW6 Does Not Allege Facts Giving Rise To a Strong Inference of Scienter.......22

          B.      Plaintiffs' Motive and Opportunity Allegations Do Not Give Rise To a
                  Strong Inference of Scienter......................................................................................23

IV.       PLAINTIFFS' SECTION 20(a) AND SECTION 20A CLAIMS FAIL ..........................24

CONCLUSION ...................................................................................................................................24

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Applestein v. Medivation, Inc.*,
No. C-10-0998, 2012 WL 986276 (N.D. Cal. Mar. 22, 2012)........................................ 13

*Benzon v. Morgan Stanley Distrib., Inc.*,
No. 3:03-0159, 2004 WL 62747 (M.D. Tenn. Jan. 8, 2004),
*aff'd*, 430 F.3d 598 (6th Cir. 2005) .......................................................................... 16

*Bolt v. Merrimack Pharms., Inc.*,
503 F.3d 913 (9th Cir. 2007)........................................................................................ 20

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) ................................................................. 14. 20

*DeMarco v. DepoTech Corp.*,
149 F. Supp. 2d 1212 (S.D. Cal. 2001) ...................................................................... 15

*Field v. Trump,*
850 F.2d 938 (2d Cir. 1988)................................................................................... 19, 20

*Fin. Acquisition Partners LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006)........................................................................................ 16

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
189 F.3d 971 (9th Cir. 1999)........................................................................................ 20

*In re Accuray S'holder Deriv. Litig.*,
757 F. Supp. 2d 919 (N.D. Cal. 2010) ........................................................................ 23

*In re Business Objects S.A. Sec. Litig.*,
No. C04-2401, 2005 WL 1787860 (N.D. Cal. July 27, 2005) ..................................... 14

*In re Daou Sys., Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005)...................................................................................... 21

*In re Dot Hill Systems Corp. Sec. Litig.*,
594 F. Supp. 2d 1150 (S.D. Cal. 2008) ....................................................................... 13

*In re Foundry Networks, Inc. Sec. Litig.*,
No. C 00-4823, 2003 WL 22077729 (N.D. Cal. Aug. 29, 2003).............................. 12, 14

*In re Metawave Commcn's Corp. Sec. Litig.*,
298 F. Supp. 2d 1056 (W.D. Wash. 2003) .................................................................. 23

*In re Netflix, Inc. Sec. Litig.*,
No. C 04-2978, 2005 WL 3096209 (N.D. Cal. Nov. 18, 2005)............................ 19, 20, 21

*In re Rackable Sys., Inc. Sec. Litig.*,
No. C09-0222, 2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ....................................... 23

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ........................................................ 24

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002), *abrogation recognized by*
    *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) ................. 22

*In re Zumiez, Inc. Sec. Litig.*,
    No. C07-1980, 2009 WL 901934 (W.D. Wash. Mar. 30, 2009) ...................... 14

*Kuehbeck v. Genesis Microchip, Inc.*,
    No. C02-05344, 2005 WL 1787426 (N.D. Cal. July 27, 2005) ....................... 14

*Lipton v. PathoGenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ...................................................................... 23

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ............................................................... 11, 23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    No. 10-CV-03451, 2011 WL 3501733 (N.D. Cal. Aug. 10, 2011) .................. 20

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    No. 10-CV-03451, 2012 WL 1868874 (N.D. Cal. May 22, 2012) .................. 22

*Stuart v. Cadbury Adams USA, LLC*,
    No. CV 09-6295, 2010 WL 1407303 (C.D. Cal. Apr. 5, 2010),
    *aff'd*, 458 F. App'x 689 (9th Cir. 2011) ...................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................. 11, 21

*Thor Power Tool Co. v. Comm'r*,
    439 U.S. 522 (1979) ...................................................................................... 20

*Werner v. Werner*,
    267 F.3d 288 (3d Cir. 2001) .......................................................................... 19

*Wozniak v. Align Tech., Inc.*,
    No. C-09-3671, 2011 WL 2269418 (N.D. Cal. Jun. 8, 2011) ........................ 23

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................... 13, 23

**RULES**

Civil L.R. 7-4(a)(3) ............................................................................................. 1

17 C.F.R. § 210.4-01(a)(1) ................................................................................. 21

1

## NOTICE OF MOTION AND MOTION

2       TO ALL PARTIES AND ATTORNEYS OF RECORD:

3       PLEASE TAKE NOTICE that on January 31, 2013, or as soon thereafter as the matter

4   may be heard, before the Honorable Lucy H. Koh of the United States District Court for the

5   Northern District of California, San Jose Courthouse, Courtroom 8, 4th Floor, 280 South 1st

6   Street, San Jose, CA 95113, Juniper Networks, Inc. ("Juniper"), Kevin R. Johnson, Robyn M.

7   Denholm and Scott G. Kriens (the "Individual Defendants") will, and hereby do, move to

8   dismiss the Second Amended Complaint for Violations of the Securities Laws pursuant to Rules

9   9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.  This motion is based on the Notice of

10  Motion and Motion, the Memorandum of Points and Authorities below, the accompanying

11  Request for Judicial Notice, the declaration of Joni Ostler ("Ostler Decl.") and attached exhibits,

12  the [Proposed] Order, the arguments of counsel, and any other matters properly before the Court.

13

## STATEMENT OF ISSUES (Civil L.R. 7-4(a)(3))

14       1.      Have Plaintiffs pled specific, particularized facts that any defendant made a false

15  statement sufficient to state a claim for primary liability under Section 10(b) of the Securities

16  Exchange Act of 1934 ("Exchange Act") and Rule 10b-5?

17       2.      Have Plaintiffs pled sufficient particularized facts showing a strong inference of

18  scienter sufficient to state a claim for primary liability under Section 10(b) of the Exchange Act

19  and Rule 10b-5?

20       3.      Should Plaintiffs' claims under Section 20(a) and Section 20A of the Exchange

21  Act be dismissed for failure to adequately allege a primary violation?

22

## MEMORANDUM OF POINTS AND AUTHORITIES

23

### INTRODUCTION

24       Plaintiffs allege that the Defendants defrauded Juniper investors by issuing false long

25  term revenue projections and by failing to make sufficient disclosures regarding a change in

26  accounting rules.  The Court dismissed Plaintiffs' prior complaint because it failed the pleading

27  requirements for a securities fraud claim in almost every respect.  The Court held that the

28  challenged projections were protected by the Safe Harbor of the Private Securities Litigation

1   Reform Act ("PSLRA") and therefore not actionable.  The Court also held that, Safe Harbor

2   aside, Plaintiffs failed to adequately allege that the projections were false when made or that any

3   Individual Defendant had the required actual knowledge of falsity.  With respect to Juniper's

4   disclosures regarding the impact of the new accounting rules, the Court found that Plaintiffs

5   failed to allege those disclosures were false or misleading or that Juniper had a legal duty to

6   disclose more details than it did.  Finally, the Court held that Plaintiffs' allegations regarding the

7   Individual Defendants' corporate positions and motive and opportunity to commit fraud were

8   insufficient to give rise to the required strong inference of scienter.

9        Apart from changes in some verbiage, Plaintiffs' Second Amended Complaint ("SAC")

10  differs from the Amended Complaint ("AC") in only two substantive respects.  First, with

11  respect to the long term revenue projections, Plaintiffs have added a total of three new

12  paragraphs to the SAC.  These paragraphs purport to describe what a new confidential witness,

13  CW6, supposedly told Plaintiffs.  However, the Court need not analyze these new allegations

14  because Plaintiffs make no effort to explain why the Safe Harbor, which the Court previously

15  held was applicable to the projections, does not, in fact, apply.  As a result, Plaintiffs' false

16  forecasting claim may be dismissed again on that basis alone.  Beyond this, CW6's vague

17  references to purported product issues and slumping sales are no different than the vague

18  allegations from Plaintiffs' other confidential witnesses that this Court held were insufficient to

19  plead falsity.  Like the other witnesses, CW6 does not explain how the problems and difficulties

20  he references would necessarily prevent Juniper from achieving its long term revenue guidance.

21  Indeed, the most telling thing about CW6 is what he does *not* say.  CW6 purportedly had access

22  to Juniper's financial forecasting system, yet never asserts that Juniper's internal revenue

23  forecasts were in any way inconsistent with the long term revenue projections that Juniper gave

24  the public.  Plaintiffs' forecasting claim should be dismissed.

25        Second, with respect to the accounting disclosure claim, the SAC simply alleges new

26  *arguments* about the purported need for further disclosure.  However, in its prior order, the Court

27  dismissed the accounting disclosure claim because Plaintiffs failed to allege *facts* showing that

28  Juniper's disclosures were materially misleading under the federal securities laws.  The SAC

contains no new facts about the Company's disclosures regarding the new accounting rules.  The crux of Plaintiffs' new arguments remains the same:  that additional details would have been helpful to investors.  Yet as this Court held, there is no duty of "completeness" under the federal securities laws.  Plaintiffs' new arguments fail to suggest, as they must, that what Juniper disclosed was false or misleading or that Juniper violated any duty to make further disclosures.  In fact, much of what Plaintiffs now argue should have been disclosed by Juniper *was* disclosed, and in some instances, repeatedly.

Plaintiffs also fail to allege any new facts that would show scienter.  Plaintiffs' new confidential witness does not claim he ever met or spoke to any Individual Defendant, much less that he was aware of what any defendant purportedly knew about the Company's accounting disclosures or long term revenue projections.  Plaintiffs' further addition of a sentence to the effect that all "insiders" sold more stock in Q1 2011 than previously, fails to salvage their claim.  To the extent this sentence purports to refer to sales by non-defendants, it is legally irrelevant.  To the extent this new sentence about stock sales refers to sales by the Individual Defendants, the Court already considered and rejected Plaintiffs' argument that these stock sales, including those made in Q1 2011, created the requisite strong inference of scienter.

Plaintiffs have made essentially trivial amendments to their complaint.  Those amendments fail to cure the defects this Court identified in its Order granting Defendants' prior motion to dismiss.  Defendants respectfully submit that the SAC should be dismissed, with prejudice.

## BACKGROUND

**The Parties.**  Juniper is a Delaware corporation headquartered in Sunnyvale, California.  *See* ¶ 25.[1]  Juniper designs and sells communications networking and security equipment and

---

[1]  References to "¶ __" are to paragraphs of the SAC filed on August 20, 2012 (Docket # 87) unless otherwise noted.  References to "Harden ¶ __" are to the Declaration of Stuart H. Harden in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Amended Complaint, which is now filed as Exhibit A to the SAC.  Exhibits ("Ex. __") are attached to the Declaration of Joni Ostler, filed herewith.  References to "Order at __" are to the Court's July 23, 2012 Order Granting Defendants' Motion to Dismiss (Docket # 84).

1   software.  ¶¶ 3, 25.  Juniper had over 9,000 full-time employees at the end of the Class Period

2   (Ex. 13 at 7) and its revenues for fiscal year 2010 were $4.093 billion.  Ex. 6 at 3.  Juniper's

3   revenues exceeded $1 billion during each quarter of the Class Period.  ¶¶ 95, 111, 140, 160.

4            Defendant Kevin R. Johnson has been Juniper's Chief Executive Officer, President, and a

5   director since August 2008.  ¶ 27.  Defendant Robyn M. Denholm has been Juniper's Chief

6   Financial Officer since August 2007.  ¶ 28.  Defendant Scott G. Kriens served as Juniper's CEO

7   from 1996 to 2008.  ¶ 26.  He stepped down as CEO in August 2008 but remained an employee

8   of Juniper until April 1, 2011.  *Id.*  Mr. Kriens has served continuously as Chairman of Juniper's

9   Board of Directors since 1996.  *Id.*

10           **The Claims.**  Plaintiffs' SAC challenges as false or misleading the same statements

11   Plaintiffs challenged in the AC, namely:  (1) Juniper's disclosures surrounding its adoption of the

12   new Financial Accounting Standards Board ("FASB") accounting rules for revenue recognition

13   and (2) Juniper's long term projections of 20% or higher year over year revenue growth.

14           **FASB's Change in Accounting Rules.**  In its Order Granting Defendant's Motion to

15   Dismiss, the Court described the new revenue recognition rules adopted by the FASB in 2009.

16   The new rules addressed the recognition of revenue in the sale of multiple-deliverable

17   arrangements (*e.g.,* equipment plus software and services) and the sale of products that include

18   software.  *See* Order at 7; Exs. 14-15.  The purpose of the new rules was to more accurately

19   reflect economic reality.  *Id.*  Under the old rules, unless Juniper could establish "fair value" for

20   every element of the multi-deliverable arrangement, then *all* revenue for the entire transaction

21   had to be deferred until delivery of every element for which Juniper could not establish "fair

22   value."  *See* Order at 7.  For example, if Juniper sold a piece of hardware that included operating

23   system software on it, but promised that the next version of the software would have a specific

24   feature the customer wanted (a "future feature"), Juniper would have to defer *all* revenues from

25   the transaction until it delivered the future feature since it was impossible to establish fair value

26   for the future feature under the old rules.  *Id.* at 6-7.

27           The new accounting rules gave companies additional methods to establish fair value and

28   required them to establish fair value for each element of multiple-element arrangements.

1  Companies determine the value of each element of the arrangement at the outset and then

2  recognize the revenue allocated to the elements as they are delivered.  Ex. 3 at 7.  Thus, in the

3  scenario described above, under the new accounting rules, Juniper would allocate the selling

4  price among the various elements in the arrangement based on the new, less restrictive fair value

5  methods and defer only that portion of the revenue attributable to the future feature.

6        The new accounting rules became mandatory for Juniper in its fiscal year 2011, but

7  FASB allowed companies to adopt the new rules early.  Order at 8.

8        **Juniper's Disclosures Regarding the Change in Accounting Rules.**  Juniper adopted

9  the new rules in Q1 2010.  *Id.*  In its Q1 2010 earnings release, Juniper disclosed that it had

10  adopted the new accounting rules for all transactions entered into after December 31, 2009.

11  Juniper also disclosed that as a result of the change in accounting rules, Juniper's Q1 revenue

12  included an additional $25 million that would have been deferred under the old rules.  Ex. 2.

13  Juniper's CFO, Ms. Denholm, repeated this information in her prepared remarks during the Q1

14  earnings call with analysts.  Ex. 9 at 4.  On the call, Ms. Denholm also answered analysts'

15  questions regarding the impact of the new rules.  *Id.* at 7-9, 12.  *See also* Ex. 10 at 11-12, 18-19;

16  Ex. 11 at 9; Ex. 12 at 12-13.

17        Two weeks later, Juniper discussed the new accounting rules in its Q1 2010 Form 10-Q.

18  Juniper discussed the new rules in three different places – in Management's Discussion and

19  Analysis, in the financial statements, and in the risk factors.  Ex. 3 at 7-8, 36-37, 62.  The Form

20  10-Q contained additional details in terms of describing the new rules, explaining how they

21  differed from the old rules and explaining how the new rules would impact both Juniper's

22  reported revenues and deferred revenues.  *Id.*  As the Court noted in its Order, while Plaintiffs

23  purport to challenge the adequacy of Juniper's disclosures, they cannot dispute that these

24  disclosures were made.  *See* Order at 8-9 ("While Plaintiffs' assert that Defendants' disclosures

25  were inadequate, they acknowledge that Defendants did, at various times, disclose their adoption

26  of the new accounting rules.").

27        **The FASB Requirements.**  As the Court also noted, during the year in which companies

28  transitioned to the new rules, FASB recognized that early recognition of revenue under the new

1   rules "would create what appeared to be a revenue boost, which could have a significant impact

2   on year-to-year comparison of financial statements . . . ." Order at 7.  Accordingly, "FASB

3   required companies in the transition period to disclose 'information that enables users of [their]

4   financial statements to understand the effect of adopting the [new rules].'"  *Id.*

5        In particular, the new rules required certain qualitative and quantitative disclosures in the

6   year of adoption (2010).  Order at 7-8.  The qualitative disclosures required a description of the

7   change in:  (1) the units of accounting (*i.e.*, what were the separate parts of the multiple-element

8   deals that Juniper sold among which Juniper was required to allocate the sales price); (2) how

9   Juniper allocated the sales price to each of those units of accounting; and (3) the pattern and

10  timing of revenue recognition.  *Id.* at 7.  Also, if the new rules were expected to have a material

11  effect on financial statements in periods after the initial adoption (*i.e.*, after Q1 2010), the rules

12  required disclosure of "quantitative information to satisfy the objective of describing the effect of

13  the change in accounting principle."  *Id.*  The rule gave three "examples of methods (but not the

14  only potential methods) that may individually or in combination provide quantitative information

15  to satisfy that objective."  *Id.* at 7-8.  Example 1 of the three examples was to disclose the

16  amount of revenue that would have been recognized under the old rule vs. the new rule.  *Id.* at 7.

17       In response to the qualitative disclosure requirements, Juniper disclosed (1) how it

18  determined its units of accounting (by evaluating each separate deliverable in a multiple-element

19  arrangement to determine if it has stand-alone value), and that the new rules did not generally

20  change those units of accounting; (2) how it allocated the sales price to each unit of accounting

21  (based on relative selling price); and (3) that for the category of sales treated differently by the

22  new rules, Juniper would be recognizing more revenue up front than it had under the old rules,

23  and as a result it expected deferred revenues on these sales to gradually decrease over time, but

24  that it could not reasonably estimate the effect of the rules on future periods because the impact

25  would depend on whether Juniper entered into the type of sales that were treated differently

26  under the new rules, and the volume of such sales.  *See* Order at 9; Ex. 3 at 6-8, 37, 62; Ex. 4 at

27  7-8, 44-45; Ex. 5 at 6-7, 41-42, 66; Ex. 6 at 32-33, 64-65.

28

1       In response to the quantitative disclosure requirements, Juniper satisfied Example 1 by

2  reporting, each quarter in the year of adoption (2010), the amount of revenue recognized under

3  the new rule that would have been deferred under the old rule (the "pick-up" revenue).  *See* Ex. 3

4  at 6-8, 37, 62; Ex. 4 at 7-8, 44-45; Ex. 5 at 6-7, 41-42, 66; Ex. 6 at 32-33, 64-65.  Juniper also

5  reported the amount of the pick-up revenue attributable to particular types of transactions.[2]

6  Juniper disclosed information regarding the new rules in several places in each quarterly SEC

7  filing.  Ex. 3 at 7-8, 36-37, 62; Ex. 4 at 6-8, 21, 44-45, 59, 70; Ex. 5 at 6-8, 20, 40-42, 66; Ex. 6

8  at 32-33, 64-66, 80.

9       **Disclosure Beyond the FASB Requirements.**  Juniper disclosed information beyond the

10  FASB requirements.  Juniper not only reported the amount of revenue recognized under the new

11  rules that would have been deferred under the old rule, but also described how much of that pick-

12  up revenue would have been deferred under different provisions of the old rules.  *See* Ex. 4 at 7,

13  21, 45, 59; Ex. 5 at 6, 20, 41, 57; Ex. 6 at 32-33.  Each quarter during the Class Period, Juniper

14  also gave a breakdown of its deferred revenue balance to enable investors to see how much

15  revenue was deferred for undelivered product commitments or other product deferrals as

16  opposed to revenue deferred because it was still in the distributor channel.  Ex. 4 at 21, 59; Ex. 5

17  at 20, 57; Ex. 6 at 49, 80; Ex. 7 at 41; Ex. 8 at 42.  Juniper also told investors how much of its

18  deferred revenue balances would be recognized in the next twelve months – "short term" or

19  "current" deferred – and how much would be recognized later than the next twelve months –

20  "long term" deferred.  ¶ 136; Ex. 4 at 21, 59; Ex. 5 at 20, 57; Ex. 6 at 49, 80; Ex. 7 at 41; Ex. 8 at

21  42.

---

24     [2] In Q1 2010, Juniper explained that the entire pick-up amount from that quarter resulted
from one sale that included undelivered elements for which, under the old rules, Juniper would
25  not have been able to demonstrate fair value (and thus revenue for the entire sale would have
been deferred).  Ex. 3 at 6.  In Q2, Q3 and Q4 2010, Juniper reported (a) the amount of the pick-
26  up that was due to sales that included undelivered product commitments ("future features"),
which under the old rules would have required deferral of *all* of the revenue from the sales, and
27  (b) the amount of the pick-up that was attributable to sales that included products plus multiple-
year service arrangements (which under the old rules would have been recognized ratably over
28  the term of the service arrangement).  Ex. 4 at 7, 45; Ex. 5 at 6, 41; Ex. 6 at 33.

1    Further, from Q2 2010 forward, Juniper added additional details to its disclosures

2    regarding the composition of its deferred revenue:  Juniper separately reported the amount of

3    deferred revenue for undelivered product commitments (*e.g.*, future software features) and other

4    product sales, the amount of deferred revenue for sales to distributors, and the amount of

5    deferred revenue for services.  Ex. 4 at 21, 59; Ex. 5 at 20, 57; Ex. 6 at 49, 80.

6        Juniper's independent auditors gave an unqualified opinion that Juniper's financial

7    statements complied with GAAP.  Ex. 6 at 55-56.

8        **Juniper's Long Term Projections.**  Like the AC, the SAC continues to challenge

9    Juniper's statements that it expected to achieve 20% or higher year over year revenue growth and

10   operating margins of 25% over the next three to five years (the "long term projections").  ¶ 15.

11   Plaintiffs allege that these projections were fraudulent and that the "truth" was revealed on July

12   26, 2011, the last day of the Class Period.  ¶ 160.  On July 26, Juniper announced that its

13   revenues for Q2 2011 would be $10 million short of the low end of its revenue guidance of

14   $1,130,000,000 - $1,190,000,000.  *Id.*  Notably, Juniper still "delivered 18% year-on-year

15   growth through the first half" of 2011.  Ex. 13 at 3.  However, in Juniper's quarterly conference

16   call with investors, it explained that business in Q2 2011 had been impacted by slower than

17   expected recovery in the macroeconomic environment, lower than expected demand for SLT

18   products and from Service Provider customers, and lower demand from Japan because of the

19   tsunami.  *Id.* at 5.  Given these factors, the Company stated that it expected revenues for fiscal

20   year 2011 to grow in the range of 12% to 14%, *i.e.*, less than the long term projections.  *Id.* at 8.

21   Following this disclosure, Juniper's stock price declined by 20.9%.  ¶ 171.

22       **The Court's Order Dismissing Plaintiffs' First Amended Complaint.**  As set forth in

23   the Court's Order granting Defendants' motions to dismiss, in their Amended Complaint

24   Plaintiffs alleged that Juniper's long term projections of 20+% year-over-year revenue growth

25   and 25+% operating margins were false and misleading because Defendants failed to disclose

26   various problems that would allegedly hamper long term growth.  Order at 4-6.  Specifically,

27   Plaintiffs relied on allegations from five confidential witnesses who purportedly stated that

28   Juniper had an insufficiently trained sales force, was experiencing slumping sales and pricing

1   pressure from competitors, and suffered software bugs and compatibility problems with its SRX

2   products.  *Id.* at 6.  Plaintiffs also alleged that Juniper's disclosures regarding the impact of the

3   new accounting rules were inadequate, and that Juniper should have disclosed numerous

4   additional facts.  *Id.* at 8-9.

5        The Court found that Juniper's long term projections were protected by the PSLRA Safe

6   Harbor and were therefore not actionable.  Order at 17-19.  The Court found that the projections

7   were identified as forward-looking statements and accompanied by meaningful cautionary

8   statements.  *Id.* at 18-19.  Further, the Court found that even if the projections had not been

9   identified as forward-looking statements and accompanied by meaningful cautionary statements

10  (which they were), Plaintiffs had not adequately pled, as they must, that Defendants "had actual

11  knowledge that their forward-looking projections were false or misleading when made."  *Id.* at

12  19-20.[3]

13       The Court also found, apart from the Safe Harbor, that Plaintiffs failed to adequately

14  plead that Juniper's long term projections were false or misleading when made.  *Id.* at 21.  The

15  Court considered the allegations offered by each of the Plaintiffs' CWs and concluded that they

16  failed to provide facts showing that the various alleged problems necessarily precluded Juniper

17  from meeting its long term projections.  *Id.* at 21-22.

18       The Court also rejected Plaintiff's challenge to Juniper's disclosures regarding the new

19  accounting rules, stating:

20          The Court agrees with Defendants that Plaintiffs have not pled sufficient facts to
            show that Defendants' disclosures were materially misleading statements under
21          the federal securities laws.  Plaintiffs concede that Juniper made various
            disclosures throughout the Class Period regarding its adoption of the new
22          accounting rules and the impact of the new rules on Juniper's financial results,
            and that Juniper's disclosure conformed to Example 1 in the FASB's disclosure
23          guidelines.  Plaintiffs merely object to the specificity and comprehensiveness of
            Juniper's various disclosures, insisting that Defendants' disclosure under Example
24          1 was insufficient and that Defendants should have made a more fulsome
            disclosure as set forth in Example 3 of the FASB guidelines.  But it is well
25          established that the PSLRA does not impose a duty of completeness.

26  _____

27       [3] The Court also found that numerous challenged statements were "simply vague assertions
     of corporate optimism and therefore not actionable under the federal securities laws."  Order at
28   21.

1   *Id.* at 24.  The Court held that Plaintiffs had failed to allege "that Defendants had an affirmative

2   duty to provide further disclosures beyond what was already included in Juniper's SEC filings" or

3   that "that disclosure of the omitted information would have significantly altered the 'total mix' of

4   information available to investors." *Id.* at 24-25.  The Court also refused to consider the

5   Declaration of Stuart H. Harden that Plaintiffs submitted in support of their opposition to the

6   motion to dismiss. *Id.* at 15.

7        Finally, the Court found that Plaintiffs had failed to adequately allege scienter. *Id.* at 25-

8   30.  The Court rejected Plaintiffs' attempt to rely on the "core operations theory" to infer scienter

9   (*id.* at 26-28), and found that the allegations regarding Defendants' stock sales did not support a

10  strong inference of scienter. *Id.* at 28-29.  The Court specifically noted that Mr. Johnson "made

11  only one sale during the entire Class Period," and Ms. Denholm's sales were all made "pursuant to

12  a Rule 10b5-1 trading plan, which Denholm created prior to the Class Period." *Id.*  Thus, although

13  Plaintiffs alleged that Mr. Kriens sold "an unusually large portion of his stock holdings," "an

14  allegation that only one Defendant displayed unusual stock trades during the Class Period is

15  insufficient to support a strong inference of scienter absent some corroborating evidence." *Id.*

16  at 29.

17       **The Second Amended Complaint.**  The SAC does not challenge any statements not

18  previously challenged in the First Amended Complaint.  The SAC does not allege any new

19  purportedly undisclosed facts.  The only two substantive changes from the First Amended

20  Complaint are:  (1) Plaintiffs add three paragraphs from a new CW who offers his opinion

21  regarding Juniper's long term projections (¶¶ 48-50); and (2) Plaintiffs copy large portions of the

22  declaration of their "expert" Stuart H. Harden into the complaint and attach his declaration as an

23  exhibit.  ¶¶ 181-93; Harden ¶¶ 6-20.

24       The remainder of the SAC essentially repeats, word for word, the allegations the Court

25  has already rejected.  For example, Plaintiffs repeat almost verbatim their allegations that

26  Juniper's long term projections were false or misleading due to (a) weakening demand, (b) an

27  inadequate sales force, (c) pricing pressures from competitors, and (d) compatibility problems in

28  SRX products with Juniper's JUNOS software.  ¶¶ 34, 72(b)-(d), 100(b)-(d), 124(b)-(d), 149(b)-

1    (d).  Plaintiffs also repeat the same allegations from CWs 1-5 that the Court already found

2    inadequate.  *Id.* ¶¶ 35-47.

3         In other words, with respect to Plaintiffs' false forecasting claim, the only new

4    allegations are three paragraphs attributed to CW6.  The only new allegations regarding the

5    accounting disclosure claim are not facts, but rather Mr. Harden's arguments as to why Juniper's

6    disclosures are purportedly inadequate.  With respect to scienter, apart from a new sentence

7    about stock sales, Plaintiffs have added nothing to the SAC.  There are no new factual allegations

8    whatsoever regarding any Individual Defendant's state of mind.

9                                            **ARGUMENT**

10   **I.    PLAINTIFFS' COMPLAINT IS SUBJECT TO STRICT PLEADING**
          **STANDARDS**

11

12        As this Court explained, Plaintiffs' complaint is subject to the heightened pleading

13   requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, which

14   imposes "formidable pleading requirements to properly state a claim."  Order at 11, quoting

15   *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008).  Plaintiffs

16   must allege both falsity and scienter with particularity.  Order at 11.  To plead falsity, Plaintiffs

17   must allege specific facts indicating why the challenged statements were false or misleading

18   when made.  *Metzler*, 540 F.3d at 1070.  To plead scienter, Plaintiffs must allege, with

19   particularity, facts giving rise to an inference of scienter that is "'cogent and at least as

20   compelling as any opposing inference of nonfraudulent intent.'"  Order at 12, quoting *Tellabs,*

21   *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  As discussed below, the SAC –

22   which is virtually unaltered from the complaint previously dismissed by this Court – fails to meet

23   these standards and should again be dismissed, this time with prejudice.

24

25

26

27

28

## II.      PLAINTIFFS STILL FAIL TO ALLEGE AN ACTIONABLE FALSE OR MISLEADING STATEMENT

### A.      Plaintiffs' Claim Based Upon Juniper's Long Term Projections Must Be Dismissed

The Court previously ruled that all of the "long-term revenue projections are either: (1) protected by the PSLRA Safe Harbor; (2) mere expressions of corporate optimism and thus not actionable; or (3) not adequately plead as false or misleading." Order at 17. Despite this ruling, Plaintiffs continue to allege, in a verbatim recitation, that Juniper's long term projections were false when made due to various purported challenges such as bugs in its SRX security products and slumping demand. *Compare* ¶ 30 *with* AC ¶ 26; *compare* ¶ 34 *with* AC ¶ 30; *compare* ¶ 46 *with* AC ¶ 42; *compare* ¶ 72 *with* AC ¶ 74; *compare* ¶ 100 *with* AC ¶ 96; *compare* ¶ 149 *with* AC ¶ 135. Since Plaintiffs have added nothing to allegations that the Court previously deemed insufficient, these allegations can be rejected.

The Court's Order also noted that Juniper's long term projections were "prototypical examples of forward-looking statements" that were both identified as such and accompanied by meaningful cautionary statements about the various factors that could prevent Juniper from achieving its long term projections. Order at 18-19. Plaintiffs allege no additional facts that could change this conclusion. The fact that Juniper's long term projections are protected by the Safe Harbor is an additional basis for dismissal.[4]

Of course, even if the long term projections were not protected by the Safe Harbor (which they are), Plaintiffs still fail to adequately allege that the projections were false when made.

---

[4] Plaintiffs allege that "most" of the challenged statements – apparently other than the projections that this Court has held are forward looking (Order at 17-19) –  are not protected by the Safe Harbor because they "related to existing facts or conditions, *i.e.*, that Juniper remained 'on track' to achieve its long term financial growth." ¶ 177. As the Court already held, however, statements "in which Defendants merely express confidence in Juniper's business and outlook" are not actionable because they are merely "vague assertions of corporate optimism." Order at 20-21; *see also In re Foundry Networks, Inc. Sec. Litig.*, No. C 00-4823, 2003 WL 22077729, at *15 (N.D. Cal. Aug. 29, 2003) ("Plaintiffs cite to no case, and the Court is aware of none, wherein it has been held that a general statement such as 'business remains on track' is sufficient to support a § 10(b) claim."). Additionally, Plaintiffs make no effort to allege these other statements were false.

1   Plaintiffs' allegations from CW1 – CW5, rejected as inadequate by this Court, are unchanged.

2   *Compare* ¶¶ 35-47 *with* AC ¶¶ 31-43; Order at 21-23.  The *only* new allegations are those

3   relating to a purportedly new confidential witness, CW6.  ¶¶ 48-50.  Thus, even if Plaintiffs had

4   alleged a basis for overcoming the Safe Harbor, their forecasting claim cannot survive unless the

5   three paragraphs Plaintiffs have added regarding CW6 adequately allege that Juniper's long term

6   revenue projections were false when made.

7          In that regard, CW6 purports to "confirm" that Juniper's long term goal of 20% year over

8   year revenue growth was "not a realistic objective." ¶ 48.  CW6 also alleges that Juniper's

9   business was "adversely affected" by various problems. ¶ 49.  But CW6 fails to explain how he

10  would have knowledge of these things, and in any event, his allegations are too vague to credit.

11         At the outset, CW6 does not even claim he had any role, much less a senior role, in

12  Juniper's revenue forecasting.  Rather, Plaintiffs allege that CW6 was responsible for managing

13  Juniper's expenses, and more particularly its annual operating expenditures.  ¶ 48.  Plaintiffs thus

14  do not allege a basis upon which to credit CW6's opinion regarding Juniper's revenue

15  projections. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)

16  (Plaintiffs must "provide an adequate basis for determining that the witnesses in question have

17  personal knowledge of the events they report.").  Nor do Plaintiffs allege any reason to believe

18  CW6 would have knowledge about the "software problems," "slumping sales" or inadequate

19  sales force headcount that CW6 "confirmed."  ¶ 49.  *See Applestein v. Medivation, Inc.*, No. C-

20  10-0998, 2012 WL 986276, at *4-5 (N.D. Cal. Mar. 22, 2012) (rejecting allegations from a

21  Senior Technology Engineer regarding pills used in clinical study); *In re Dot Hill Systems Corp.*

22  *Sec. Litig.*, 594 F. Supp. 2d 1150, 1163 (S.D. Cal. 2008) (rejecting allegation from engineer CW

23  that defendant company was "generally understaffed";  plaintiff "[did] not explain why an

24  engineer would be in the position of knowing the staffing situation throughout the company.").

25         Beyond the foregoing, the allegations attributed to CW6 suffer from the same defect as

26  those of Plaintiffs' other confidential witnesses – that is, as this Court previously observed,

27  Plaintiffs allege no "specific facts" regarding how the "'problems' and 'difficulties'" purportedly

28  identified by CW6 "necessarily precluded Juniper from reaching its projected growth targets."

1    Order at 21.  Thus, while CW6 is alleged to have said Juniper's business was "adversely

2    affected" by unspecified "software problems," "slumping sales" for unspecified "major routing

3    and switching products," and a "lower than expected sales force headcount" (¶ 49), there are no

4    quantifiable or concrete facts alleged, such as the financial impact of the purported problems,

5    which "major products" were purportedly facing slumping sales and why the products were

6    "major."  *See, e.g.*, *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1201-02 (N.D. Cal. 2008)

7    (generalized CW allegations that Yahoo! revenues "began to decline" and that it was "not

8    attaining its revenue forecasts" were insufficient to plead falsity).[5]

9          Similarly, although CW6 says that Juniper's adoption of the new FASB rules allowed it

10   to recognize "$20 million in additional revenue in one quarter," and to meet its forecast in that

11   unidentified quarter (¶ 50), CW6 does not claim this was not real revenue, or, for that matter, that

12   the revenue impact from the accounting rule changes (which, as discussed above and below,

13   Juniper conspicuously and repeatedly disclosed) was not specifically taken into account when

14   Juniper made its long term projections.  *See Foundry Networks,* 2003 WL 22077729, at *8, 10

15   (dismissing false forecasting claims; plaintiffs failed to allege facts demonstrating that the

16   forecasts did not take into account the allegedly undisclosed facts).

17         Ultimately, it is not what CW6 is alleged to have said that is most telling, but what he is

18   *not* alleged to have said.  Plaintiffs allege CW6 had access to internal systems at Juniper that

19   "tracked [the Company's] financial forecasts."  ¶ 48.  Yet, Plaintiffs never assert that the

20   Company's financial forecasts, to which CW6 purportedly had access, showed – at any point in

21   time – that Juniper would not reach its long term projections.

22

23         [5] *See also In re Business Objects S.A. Sec. Litig.*, No. C04-2401, 2005 WL 1787860, at *5-7
24   (N.D. Cal. July 27, 2005) (allegations that "orders were being delayed and canceled" and that
     "some sales" were improperly recorded were insufficient; the court was "left to speculate as to
     the date, sales quantity, and other relevant details"); *Kuehbeck v. Genesis Microchip, Inc.*, No.
25   C02-05344, 2005 WL 1787426, at *8 (N.D. Cal. July 27, 2005) (allegations of "declining orders
     from customers and lost sales" insufficient without details such as the financial impact of the
26   allegedly lost sales); *In re Zumiez Inc. Sec. Litig.*, No. C07-1980, 2009 WL 901934, at *11, 15
     (W.D. Wash. Mar. 30, 2009) (dismissing complaint with prejudice where "even if Defendants
27   had foreseen certain problems that could have negatively affected the late-year earnings, nothing
     suggests that they did not factor those considerations into their [earnings projections]").
28

1    The Court should dismiss Plaintiffs' challenge to Juniper's long term projections.

2    **B.    Plaintiffs Fail To Allege Any False Or Misleading Statement Regarding The New Accounting Rules**

3

4    Plaintiffs also repeat their claim that Juniper should have disclosed additional details

5    regarding the impact of the new accounting rules.  ¶¶ 12-17, 51-60, 62-67, 81-85, 89-95, 105-09,

6    112, 116-19, 130-36, 179-204.  This claim should again be dismissed.

7    **1.    Plaintiffs Fail to Allege That Juniper's Disclosures Violated FASB's Guidelines**

8

9    The SAC adds no new facts regarding Juniper's disclosures or any purported duty to

10   disclose.  Thus, as before, Plaintiffs must "concede that Juniper made various disclosures

11   throughout the Class Period regarding its adoption of the new accounting rules and the impact of

12   the new rules on Juniper's financial results, and that Juniper's disclosure conformed to Example

13   1 in the FASB's disclosure guidelines."  Order at 24.

14   Indeed, all that is new in the SAC are *arguments* as to why the Court was purportedly

15   incorrect in holding that Plaintiffs "failed to plead facts showing that Defendants had an

16   affirmative duty to provide further disclosures beyond what was already included in Juniper's

17   SEC filings."  *Id.* at 24-25.  These new arguments about the purported inadequacies of Juniper's

18   disclosures are without substance.

19   **a.    Mr. Harden's Declaration Should Not Be Considered**

20   As an initial matter, the Court should decline to consider the Harden Declaration attached

21   to Plaintiffs' complaint.  The holding in *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212

22   (S.D. Cal. 2001), a securities class action like the present case, is instructive.  There, plaintiffs

23   alleged that defendants misrepresented the efficacy and nontoxicity of an anticancer drug.  They

24   attached to their complaint the affidavit of a Yale University School of Medicine professor who

25   provided expert testimony regarding the interpretation and evaluation of data generated by new

26   drug clinical trials, as well as his opinion as to the materiality of the alleged misrepresentations.

27   The Court granted the defendants' motion to strike the expert's affidavit.  The Court stated:

28   The Court further questions whether any good reason exists for a plaintiff to attach an expert affidavit as an exhibit to a complaint.  The inclusion of such an affidavit

1
2
3
4
5

in no way relieves a plaintiff of its burden to comply with the Reform Act and the applicable provisions of the Federal Rules of Civil Procedure. Because the Court must generally assume the truth of all material factual allegations in a complaint, averments in an expert affidavit carry no additional probative weight merely because they appear within an affidavit rather than numbered paragraphs of the complaint. A securities fraud complaint must, regardless of its form and attachments, provide the factual specificity required by the Reform Act and Rule 9(b). Conclusory allegations and speculation carry no additional weight merely because a plaintiff placed them within the affidavit of a retained expert.

6   *Id.* at 1221-22; *see also Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir.

7   2006) (holding that district court properly refused to consider opinions in expert's affidavit

8   attached to complaint; "PSLRA complaints must allege specific facts … opinions cannot

9   substitute for facts under the PSLRA.").[6] The same logic applies here. The SAC must stand or

10  fall based on what Plaintiffs have alleged, not upon any purported expert opinion.

11
12

**b.      Plaintiffs and Mr. Harden Fail to Explain Why Any Additional Disclosures Were Needed to Satisfy FASB**

13        Even if considered, Mr. Harden's opinions do not save Plaintiffs' defective claim.

14  Although Plaintiffs have dutifully copied into the SAC each of Mr. Harden's three arguments as

15  to why, despite this Court's prior decision to the contrary, Juniper's disclosures were purportedly

16  inadequate, none of those arguments has merit. *See* ¶¶ 15-17, 65-67, 81-83, 92-94, 106-08, 116-

17  18, 132-34, 191(a)-(c); Harden ¶ 18.

18        Plaintiffs first allege, based upon Mr. Harden's declaration, that Juniper should have

19  disclosed "[t]he magnitude of deferred revenue recognized in 2010 under previous accounting

20  rules" and "the periods over which such deferred revenue [was] expected to be recognized."

21  ¶ 191(b); Harden ¶ 18.b. Plaintiffs claim that this information was necessary because investors

22  needed to understand that Juniper continued to recognize revenues from its deferred revenue

23  balances, while also recognizing more revenue up front from new sales under the new rules –

24

25        [6] *See also Stuart v. Cadbury Adams USA, LLC*, No. CV 09-6295, 2010 WL 1407303, at *4

26  (C.D. Cal. Apr. 5, 2010) (holding that expert report generated for purposes of litigation and attached to complaint is not properly considered part of complaint), *aff'd*, 458 F. App'x 689 (9th

27  Cir. 2011); *Benzon v. Morgan Stanley Distrib., Inc.*, No. 3:03-0159, 2004 WL 62747, at *3 (M.D. Tenn. Jan. 8, 2004) (refusing to consider expert opinions and analysis appended to

28  complaint), *aff'd*, 430 F.3d 598 (6th Cir. 2005).

1    what Plaintiffs and Mr. Harden call the "bump." ¶¶ 15, 191(b); Harden ¶ 18.b.  Juniper *did*

2    disclose this information.

3           In its FY 2009 10-K, filed on February 26, 2010, Juniper reported the amount of deferred

4    revenue it had on its balance sheet as of the end of 2009, *i.e.*, the amount of deferred revenue on

5    its books before the adoption of the new rules in January 2010.  Ex. 1 at 87.  As Plaintiffs

6    themselves concede, Juniper also broke its deferred revenue balance into two categories:  "short

7    term" or "current" deferred, meaning deferred revenue that was expected to be recognized in the

8    next twelve months, and "long term" deferred, meaning deferred revenue that was expected to be

9    recognized later than the next twelve months (after 2010).  ¶ 193; Harden ¶ 20.  Thus, simply by

10   looking at Juniper's FY 2009 10-K, investors could see the magnitude of deferred revenue

11   Juniper expected to recognize in FY 2010 under the old accounting rules, and how much

12   deferred revenue was expected to be recognized in FY 2011 or later.  *Id.*  In other words, Juniper

13   disclosed precisely what Plaintiffs claim to be missing – "the magnitude of deferred revenue

14   recognized in 2010 under previous accounting rules" and "the periods over which such deferred

15   revenue [was] expected to be recognized."  ¶ 191(b).

16          Although Juniper made this disclosure, the disclosure was *not* "necessary," as Plaintiffs

17   and Mr. Harden contend, to allow investors to understand that Juniper (a) continued to recognize

18   revenue from its deferred revenue balances generated under the old rules, and (b) generally

19   recognized more revenue up front under the new rules – two facts which, taken together,

20   Plaintiffs and Mr. Harden call the "bump." ¶¶ 191(b); Harden ¶ 18.b.  Juniper separately told

21   investors both of these things.  Each quarter in 2010, Juniper told investors that the new rules

22   allowed Juniper to recognize revenue that would otherwise have been deferred under the old

23   rules.  Ex. 3 at 6; Ex. 4 at 6-7; Ex. 5 at 6; Ex. 6 at 32-33.  Each quarter, Juniper also told

24   investors that it was recognizing previously deferred revenue from the balance sheet, and

25   explained the specific criteria it followed to determine when that revenue could be recognized.

26   Ex. 3 at 6-8; Ex. 4 at 6-8; Ex. 5 at 6-8; Ex. 6 at 32-33.  Both propositions were also explained on

27   conference calls.  Thus, on Juniper's Q1 2010 conference call, Ms. Denholm explained that the

28   new rules generally allowed Juniper to recognize more revenue up front.  *See* Ex. 9 at 8 ("[F]rom

1    the first of January onwards [] the new rules apply; and what that means in terms of the future

2    feature commitment area is that you still defer an amount of revenue, but the amount is

3    commensurate with the value of those features *as opposed to deferring the whole of the revenue*

4    *amount.*") (emphasis added).  Ms. Denholm also explained that Juniper continued to recognize

5    deferred revenues from the balance sheet under the old rules:

> Even with the adoption of the new revenue recognition rules, we continue to defer
> product revenue for arrangements entered into prior to the beginning of the year,
> and we will recognize those revenues under the old rules.

8    *Id.* at 6.  Finally, Ms. Denholm explained that revenue "that has been on the balance sheet under

9    the old rules" was expected to be recognized "over the next four to six quarters."  Ex. 10 at 18.

10   In other words, Juniper told investors in unmistakable language that it was continuing to

11   recognize deferred revenue from transactions under the old rules, while also recognizing more

12   revenue up front under the new rules.

13          Plaintiffs' and Mr. Harden's second theory is that Juniper's disclosures were inadequate

14   because Juniper did not disclose "[a] breakdown of deferred revenue under the old and new

15   accounting rules" (*i.e.*, Example 3) so that investors could "understand [the] changes in the

16   pattern of revenue recognition as a result of the adoption of the new rules."  ¶ 191(c); Harden

17   ¶ 18.c.  At the outset, Plaintiffs do not explain what they mean by a "breakdown of deferred

18   revenue."  ¶ 66.  Juniper provided many details and breakdowns regarding its deferred revenues

19   and deferred revenue balances.  *See supra* at 7-8.  Plaintiffs also do not explain, as they must to

20   state a claim for securities fraud, why any supposed inability to understand "the changes in the

21   pattern of revenue recognition" rendered Juniper's financial statements misleading.  Order at 27

22   (holding that it is not enough to allege that a disclosure was not "complete"; it must also be false

23   or misleading).  While Plaintiffs assert that more disclosure was required "because the new

24   accounting rules generally result in less deferred revenue" than the old rules (¶¶ 66, 191(c)),

25   Juniper disclosed, repeatedly, that it expected deferred revenue balances to decline over time

26   under the new rules.  *Supra* at 6; ¶¶ 84, 109, 135; Order at 9.[7]  Juniper also told investors its

27

28          [7] Ultimately, Juniper's deferred revenues did not decline as Juniper expected (*compare* Ex. 1
     at 87 *with* Ex. 6 at 49 *with* Ex. 4 at 21), thus confirming what Juniper also said in that disclosure,
                                                                                                   (continued...)

1   deferred revenue balances each quarter.  Ex. 3 at 17; Ex. 4 at 21, 59; Ex. 5 at 20, 57; Ex. 6 at 49,

2   80.  Thus, investors could see for themselves whether Juniper's deferred revenue balances were

3   declining after the new accounting rules were adopted, and if so, by how much.  Nothing more

4   was required.

5          Finally, Plaintiffs allege, based upon Mr. Harden's declaration, that Juniper should have

6   disclosed the impact of the rule change on operating margins, net income, and earnings per share.

7   ¶¶ 67, 191(a); Harden ¶ 18.a.  Notably, this information is not even found among the proposed

8   disclosures in FASB's Example 1, 2 or 3.  It is merely additional detail that Plaintiffs and Mr.

9   Harden plucked from thin air, and claim was "necessary" for investors "to understand" the

10  impact of the new rules.  Apart from the fact that Plaintiffs offer no explanation *why* this

11  information was "necessary," much less why the absence of this information rendered Juniper's

12  financial statements misleading, Plaintiffs themselves purport to calculate this very information –

13  *i.e.*, the new rules' impact on operating margins, net income and earnings per share in each

14  quarter of 2010 – based upon information in Juniper's public disclosures.  ¶¶ 62, 89, 112-13.

15  Plaintiffs have thus conceded that Juniper disclosed the very information that would allow

16  investors to calculate those metrics themselves.  *In re Netflix, Inc. Sec. Litig.*, No. C 04-2978,

17  2005 WL 3096209, at *9 (N.D. Cal. Nov. 18, 2005) (dismissing 10b-5 claim based on failure to

18  disclose "churn rates" where the "raw data that would have allowed investors and analysts to

19  calculate" those rates were disclosed); *Werner v. Werner*, 267 F.3d 288, 299 (3d Cir. 2001)

20  (affirming dismissal of 10b-5 claim where "the shareholders had access to all of the information

21  necessary to calculate the exact amount of the benefit management incurred[.]"); *Field v. Trump,*

22

23  _____

            (...continued from previous page)
24  *i.e.,* that while it expected deferred revenues to decline, it could not reasonably estimate the
    effect of the new rules on future financial periods.  *See* Order at 9.  Despite the fact that Juniper's
25  deferred revenues did not decline as expected, Plaintiffs assert, without support, that Juniper
    "simply chose not to" estimate the impact of the new rules on future periods. ¶ 85.  Plaintiffs do
26  not allege any facts to support this conclusory allegation, just as they do not explain how Juniper
    could supposedly make an estimate that would involve projecting (1) how many multiple-
27  element arrangements would be sold in future periods that would include undelivered elements;
    and (2) the value that would be assigned to the delivered versus undelivered elements (which
28  would dictate the amount of revenue that must be deferred under the new rules).

850 F.2d 938, 949 (2d Cir. 1988) (failure to perform calculation for investors is not actionable

disclosure).[8]

In sum, Plaintiffs' new arguments as to why Juniper's disclosures were purportedly

inadequate fail to allege any violation of the federal securities laws.

As the Supreme Court and the Ninth Circuit have recognized:

> 'generally accepted accounting principles' are far from being a canonical set of
> rules . . . [they] tolerate a range of reasonable treatments,' [and] we generally
> defer to the professional judgment of the accountant who audited or prepared the
> financial statements, unless a GAAP authority *demands* a contrary accounting
> treatment.

*Bolt v. Merrimack Pharms., Inc.*, 503 F.3d 913, 918 (9th Cir. 2007), quoting *Thor Power Tool*

*Co. v. Comm'r*, 439 U.S. 522, 544 (1979).  Analogously, FASB could have, but *did not*, demand

a uniform set of metrics for all companies to report.  Order at 7; Ex. 14 at 3.  Rather, FASB

allowed companies to use their own judgment, implicitly recognizing that reasonable minds can

differ regarding the quantitative disclosures that were sufficient to fulfill the disclosure objective.

Here, Juniper disclosed the metrics suggested in Example 1 *plus* various additional details.

*Supra* at 7-8.  Plaintiffs' assertion that Juniper should have disclosed more, or packaged the

information differently, cannot support a securities fraud claim.  Order at 23-24; *Brody*, 280 F.3d

at 1006 (holding federal securities laws prohibit only false or misleading statements, not

statements that are incomplete); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,* No. 10-

CV-03451, 2011 WL 3501733, at *11 (N.D. Cal. Aug. 10, 2011) (same); *Netflix*, 2005 WL

---

[8] Plaintiffs again press their allegations that, although Juniper reported the dollar impact of the new accounting rules in its quarterly financial statements in its Forms 10-Q, Juniper should have repeated that same information in its press releases and conference calls.  *See* ¶¶ 58, 62-64, However, this theory, that the disclosures were "buried" and needed to be repeated in press releases and conference calls was rejected by this Court because repetition would not significantly alter the total mix of information available in the market.  *See* Order at 23-24; *See also Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981-82 (9th Cir. 1999) (rejecting claim that FHI, a holding company of Ford Motors, was required to disclose, again, that Ford Motors could cash out FHI shareholders because the prospectuses for the initial offerings of FHI disclosed that shareholders could be cashed out at any time); *Netflix*, 2005 WL 3096209, at *8 (rejecting claim that failure to repeatedly disclose company's formula for calculating churn rate was misleading where company had disclosed formula in a press release and quarterly reports more than five months earlier).

1  3096209, at *9 (rejecting claim that disclosures violated federal securities laws because they

2  could have been presented more clearly).[9]

3  ### III.   PLAINTIFFS FAIL TO ALLEGE A "STRONG INFERENCE" OF SCIENTER

4        Because Plaintiffs have failed to allege any false or misleading statement, it necessarily

5  follows that Plaintiffs have not adequately plead facts from which one can infer that the

6  defendants actually knew their statements to be false or misleading.  *See* Order at 27.

7  Regardless, the SAC fails to allege facts creating a "strong inference" that the defendants acted

8  with scienter or fraudulent intent.

9        To create a strong inference of scienter, a plaintiff must allege facts demonstrating that

10  the defendant "'made false or misleading statements either intentionally or with deliberate

11  recklessness.'"  Order at 25, quoting *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1022 (9th

12  Cir. 2005).  As this Court instructed Plaintiffs, "deliberate recklessness" must "'reflect some

13  degree of intentional or conscious misconduct.'"  Order at 25, 26 (citations omitted).  For

14  forward-looking statements, the standard is even higher – Plaintiffs must plead facts creating a

15  strong inference that the defendants made the forecasts with "actual knowledge" that they were

16  false when made.  *Id.*  An inference of scienter, moreover, must be "more than merely

17  'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other

18  explanations.'"  *Id.* at 26 (citing *Tellabs*, 551 U.S. at 324).  A complaint will survive "only if a

19  reasonable person would deem the inference of scienter cogent and at least as compelling as any

20  opposing inference one could draw from the facts alleged."  *Id.*

21        The Court previously found that Plaintiffs failed to allege facts giving rise to a strong

22  inference of scienter.  Order at 26-30.  In reaching that conclusion, the Court considered and

23  _____

24      [9] Plaintiffs separately assert that, under SEC regulations, financial statements that are not
prepared in compliance with GAAP are presumed to be misleading.  ¶ 180 (citing Regulation S-X

25  (17 C.F.R. § 210.4-01(a)(1)).  This is a *non-sequitur*.  Plaintiffs nowhere allege that Juniper
improperly recognized revenue under either the old or new accounting rules, and nowhere allege

26  that Juniper's financial statements did not comply with GAAP.  Rather, Plaintiffs' argument is that
Juniper should have made additional disclosures that were, by Plaintiffs' own admission, *not*

27  mandated by FASB.  *See* ¶ 186 (conceding FASB "does not prescribe what quantitative
disclosures would be necessary" but instead gives three examples); ¶ 192 (conceding that the

28  additional disclosures Plaintiffs list merely "might" be required "in certain circumstances").

1  rejected Plaintiffs' allegations regarding the Individual Defendants' corporate roles and alleged

2  knowledge of Juniper's inner workings (*id.* at 26-27), as well as Plaintiffs' "motive and

3  opportunity" allegations (*id.* at 28-29).  The SAC adds no new facts whatsoever regarding the

4  Individual Defendants' states of mind, nor any new facts regarding the Individual Defendants'

5  supposed motive and opportunity to commit fraud.  *Compare* AC ¶¶ 31-43 *with* ¶¶ 35-50; AC

6  ¶¶ 165-68 *with* ¶¶ 217-20; and AC ¶¶ 177-86 *with* ¶¶ 206-16.  Since literally the only new factual

7  allegations (aside from a sentence regarding stock sales discussed below) are those attributed to

8  CW6, the Court need look no further than CW6 to see if the SAC has cured Plaintiffs' earlier

9  failure to plead scienter.

### A.  CW6 Does Not Allege Facts Giving Rise To a Strong Inference of Scienter

11  At the outset, CW6 does not say anything regarding the adequacy of Juniper's disclosures

12  surrounding the new accounting rules.  Thus, the allegations attributed to CW6 cannot support a

13  claim that any defendant was deliberately reckless with respect to those disclosures.

14  Additionally, since the allegations attributed to CW6 are insufficient to allege Juniper's long

15  term projections were false when made (*supra* at 13-14), those allegations cannot give rise to a

16  strong inference of scienter.  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091-92 (9th Cir.

17  2002) (where "the alleged problems upon which [a false forecasting claim] relies have

18  themselves not been pleaded successfully," there is no basis upon which to say that "the

19  defendants knew that their forecasts could not possibly be accurate."), *abrogation recognized by*

20  *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008).

21  Regardless, CW6 does not claim to know what any Individual Defendant knew or when

22  he or she knew it.  *See* ¶¶ 48-50.  In fact, CW6 does not claim he even had contact with or spoke

23  to any Individual Defendant.  Rather, essentially all that Plaintiffs have alleged is CW6's

24  unsubstantiated opinion that the long term revenue projections were "not [] realistic."  ¶ 48.  This

25  is manifestly not enough to plead the requisite strong inference.  *See, e.g., Police Ret. Sys. of St.*

26  *Louis v. Intuitive Surgical, Inc.*, No. 10-CV-03451, 2012 WL 1868874, at *20 (N.D. Cal. May

27  22, 2012) (finding where confidential witnesses did not "actually communicate[] with any of the

28  Individual Defendants" they "offer little, if any, reliable basis from which to infer scienter."); *In*

1   *re Metawave Commcn's Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1073 (W.D. Wash. 2003)

2   (holding CW allegations did not support scienter because "CW7's belief that [company]

3   executives lied to hide the truth from investors and the public is merely his opinion"); *In re*

4   *Accuray S'holder Deriv. Litig.*, 757 F. Supp. 2d 919, 932 (N.D. Cal. 2010) (finding CW

5   allegations "do not add anything meaningful to the complaint" where CWs did not have contact

6   with defendants and had "no knowledge of what either Defendant knew at the time each of the

7   challenged statements was made."); *In re Rackable Sys., Inc. Sec. Litig.,* No. C09-0222, 2010

8   WL 199703, at *8 (N.D. Cal. Jan. 13, 2010) (finding plaintiff failed to allege scienter where no

9   CW "heard or read any statement by any defendant, that contradicted or even cast doubt on a

10  public statement made during the class period.") (citation omitted); *Zucco*, 552 F.3d at 995, 998

11  (holding witness statements that do not reflect "reliable personal knowledge of the defendant's

12  mental state" fail to support an inference of scienter).

13          **B.      Plaintiffs' Motive and Opportunity Allegations Do Not Give Rise To a Strong
                      Inference of Scienter**
14

15          Plaintiffs' remaining allegations are the same motive and opportunity allegations that the

16  Court already found inadequate.  Order at 28-30; *Compare* AC ¶¶ 177-86 *with* ¶¶ 206-16 and AC

17  ¶¶ 165-68 *with* ¶¶ 217-20.  As the Court explicitly told Plaintiffs in dismissing the AC, "Ninth

18  Circuit case law makes clear that such 'motive and opportunity evidence alone is insufficient to

19  establish scienter at the pleadings stage.'"  Order at 29 (citing *Lipton v. PathoGenesis Corp.*, 284

20  F.3d 1027, 1035 (9th Cir. 2002)); *see also Metzler*, 540 F.3d at 1066-67.  Thus, Plaintiffs'

21  recycled motive and opportunity allegations need not be considered.

22          Plaintiffs' only new allegation regarding scienter is a single sentence to the effect that

23  "open market insider sales" increased in the first quarter of 2011 as compared to 2010 and 2009.

24  ¶ 20.  Plaintiffs do not identify which "insiders" are referenced here.  To the extent Plaintiffs are

25  referring to sales by non-defendants, those sales are irrelevant.  *See, e.g.*, *Wozniak v. Align Tech.,*

26  *Inc.*, No. C-09-3671, 2011 WL 2269418, at *14 (N.D. Cal. Jun. 8, 2011) (rejecting that alleged

27  "suspicious" sales of other company insiders supported scienter because "[s]ales by insiders not

28  named as defendants . . . are irrelevant to the determination of the named defendant's scienter");

*In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1082 n.22 (N.D. Cal. 2001) (finding "no reason to consider" named non-defendants' stock sales in considering defendants' scienter where plaintiffs did not allege specific facts indicating that insiders possessed non-public adverse information).  To the extent Plaintiffs are saying that the Individual Defendants' stock sales increased in Q1 2011, the Court already found that "the Individual Defendants' stock sales from 2009-2011 [including the sales by Mr. Kriens] do not support a strong inference of scienter."  Order at 28.

## IV.     PLAINTIFFS' SECTION 20(a) AND SECTION 20A CLAIMS FAIL

Plaintiffs' claims under Section 20(a) and Section 20A fail because the SAC does not adequately allege a primary violation under Section 10(b).  Order at 30.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' Second Amended Complaint.  Because Plaintiffs have already had a chance to amend and have demonstrated that they are unable to allege any additional facts that could save their claims, this action should be dismissed with prejudice.


Dated:  September 17, 2012                    WILSON SONSINI GOODRICH & ROSATI
                                              Professional Corporation


                                              By      /s/ Nina F. Locker
                                                        Nina F. Locker

                                              *Attorneys for Defendants*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ECF CERTIFICATION

I, Joni Ostler, am the ECF user whose identification and password are being used to file the Defendants' Notice of Motion and Motion to Dismiss Second Amended Complaint for Violation of the Federal Securities Laws.  In compliance with General Order 45.X.B, I hereby attest that Nina F. Locker has concurred in this filing.

Dated:  September 17, 2012

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By: _____/s/ Joni Ostler_____
         Joni Ostler