IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CITY OF ROYAL OAK RETIREMENT SYSTEM, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JUNIPER NETWORKS, INC., et al.,<br><br>Defendants. | CASE NO. 5:11-CV-04003-LHK<br><br>ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT WITHOUT LEAVE TO AMEND; AND DISMISSING ACTION WITH PREJUDICE<br><br>[Re: Docket Item No. 91] |

Defendants Juniper Networks, Inc. ("Juniper" or "the Company"), Kevin R. Johnson ("Johnson"), Robyn M. Denholm ("Denholm"), and Scott G. Kriens ("Kriens") (collectively, "Defendants") move to dismiss Plaintiffs' second amended complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. *See* Mot. to Dismiss, ECF No. 91. The motion has been fully briefed. *See* Opp'n., ECF No. 99; Reply, ECF No. 100. The Court found the motion to be appropriate for disposition without oral argument pursuant to Civil Local Rule 7-1(b) and vacated the hearing that had been set for May 16, 2013. Order Vacating Hr'g, ECF No. 104. For the reasons explained below, the Court GRANTS the motion as to all defendants without leave to amend and DISMISSES the action with prejudice.

## I. BACKGROUND

### A. Procedural History

The City of Royal Oak Retirement System filed this putative securities fraud class action against Defendants on August 15, 2011. Compl., ECF No. 1. Several entities sought appointment as lead plaintiff and approval of lead counsel. The Court appointed the City of Omaha Police and Fire Retirement System and the City of Bristol Pension Fund as lead plaintiffs and appointed Scott+Scott LLP as lead counsel. Order, ECF No. 42. Plaintiffs filed an amended complaint on February 13, 2012. Am'd Compl., ECF No. 47.

On July 23, 2012, the Court issued an order that *inter alia* granted Defendants' motions to dismiss the amended complaint with leave to amend ("July 23 Order"). July 23 Order, ECF No. 84. The thirty-two page order explained in detail how the amended complaint was deficient. *Id*. The order expressly advised Plaintiffs that "[f]ailure to cure the deficiencies identified herein will result in dismissal with prejudice." *Id*. at 32.

Plaintiffs filed the operative second amended complaint ("SAC") on August 20, 2012, asserting claims on behalf of persons who purchased or otherwise acquired Jupiter's common stock between July 20, 2010 and July 26, 2011, inclusive (the "Class Period"). SAC, ECF No. 87. Plaintiffs assert three claims: (1) securities fraud under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 of the Securities and Exchange Commission ("SEC"); (2) controlling person liability under § 20(a) of the Exchange Act; and (3) insider trading under § 20A of the Exchange Act. *Id*.

### B. Factual Allegations

Juniper designs and sells communications networking equipment to larger global service providers, enterprises, and public sector organizations. SAC ¶ 3, ECF No. 87. "Juniper's primary product and service offerings are its core routers and switches that allow customers to move voice, video, and data traffic across their networks, as well as its security products and software that enable the secure and efficient operation of data networks." *Id*. All Juniper hardware systems, including routing, switching, and security devices, use Juniper's proprietary JUNOS network operating system. *Id*. ¶ 6. The biggest competitor of the JUNOS operating system is the IOS operating

system of Cisco Systems, Inc. ("Cisco"). *Id*. ¶ 7.

Johnson, Denholm, and Kriens held key positions at Juniper during the Class Period. Johnson was the company's president, chief executive officer ("CEO"), and director. *Id*. ¶ 27. Denholm was the company's chief financial officer ("CFO") as well as an executive vice president. *Id*. ¶ 28. Kriens was the chairman of the board of directors. *Id*. ¶ 26.

On February 23, 2010, prior to the start of the Class Period, Juniper hosted an analyst day conference during which it disclosed a long-term business plan calling for a 20+% growth in revenue and a 25+% operating margin over the next three to five years. *Id*. ¶ 30. On July 20, 2010, the first day of the Class Period, Juniper issued a press release announcing its preliminary 2Q10 financial results, which were filed the same date on a Form 8-K. *Id*. ¶ 61. Juniper reported a 24% increase in revenue on a year-over-year basis and a non-GAAP[1] operating margin of 23.9%. *Id*. Juniper attributed its financial results to skillful execution of its business plan and increased demand for its products, and expressed bullish future expectations through a number of comments, for example, that it was "well on track to delivering profitable growth in 2010 and making progress against [its] long-term revenue growth objective while expanding operating margins." *Id*. ¶ 68; *see also* ¶¶ 61, 69-71.

Throughout the Class Period, Juniper continued to report that it "was still on track to meet its long-term business plan of 20+% revenue growth and 25+% operating margins." *Id*. ¶ 95. Juniper also continued to make bullish statements such as the following: "[O]ur demand indicators are strong, our portfolio is robust and we are focused on executing against the market opportunity ahead of us." *Id*. ¶ 95; *see also* ¶¶ 88, 96-99, 103, 111, 119-23, 129, 137, 140, 142. Juniper's stock price rose during the Class Period, from $26.60 per share the day before the start of the Class Period to a high of $44.46 per share on March 8, 2011. *Id*. ¶¶ 73, 139. On March 3, 2011, when the stock price was at its peak, Juniper conducted a $1 Billion Debt IPO. *Id*. ¶ 138.

Plaintiffs allege that Juniper's long-term projections were false and misleading because "Defendants knew but failed to disclose, the Company's business fundamentals did not support

---

[1] "GAAP" refers to Generally Accepted Accounting Principles. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 705 (9th Cir. 2012).

3

CASE NO. 5:11-CV-04003-LHK
ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT WITHOUT LEAVE

these lofty revenue and operating margin targets." SAC ¶ 34, ECF No. 87. According to Plaintiffs, Juniper was experiencing "slumping sales and intense pricing pressures," as well as problems with its proprietary JUNOS operating system. *Id*. Moreover, Juniper did not have the sales force necessary to grow its network business (routers and switches) at the projected levels. *Id*.

Plaintiffs also allege that Juniper's financial reporting was false or misleading because Defendants did not adequately disclose the impact of the company's adoption of new revenue recognition rules issued by the Financial Accounting Standards Board ("FASB"). Under the old rules, when Juniper sold hardware or software that included an ongoing obligation to provide service or maintenance ("multiple-element arrangements" or "multiple-deliverable arrangements"), Juniper was required to defer recognition of a significant portion of the total sales price until such obligation was satisfied. *Id*. ¶¶ 51-53. Under the new rules – Accounting Standards Update ("ASU") 2009-13 and ASU 2009-14 – Juniper had discretion to determine the value of the undelivered portion of the ongoing obligation and was required to defer revenue recognition only with respect to that undelivered portion. *Id*. ¶ 54. Once Juniper adopted the new rules, there was an initial period in which it recognized more of its revenue up-front on current period sales while it continued to recognize deferred revenue on past-period sales. *Id*. Plaintiffs allege that as a result of this temporary bump in revenue, Juniper's financials gave the appearance that the company was meeting its long-term growth targets when in fact Juniper's actual revenue growth was trending down. *Id*. ¶ 55. For example, Plaintiffs allege that while Juniper reported revenue growth of 24.4%, 22.9%, and 26.4% in 2Q10, 3Q10, and 4Q10, respectively, Juniper's "actual" revenue growth was only 17.7%, 16.8%, and 14.8%, respectively. *Id*. Plaintiffs allege that during this same period, Juniper's much larger competitor, Cisco, reported less robust revenue growth and suffered a decline in its stock price. *Id*. ¶ 9. While the purpose of the juxtaposition of the two companies' financials is not entirely clear, Plaintiffs may wish the Court to infer that the market assumed that Juniper was picking up customers from Cisco.

Plaintiffs acknowledge that Juniper publicly disclosed its adoption of the new revenue recognition rules. *Id*. ¶ 59. However, Plaintiffs assert that the disclosures were not sufficiently detailed and comprehensive to inform the market that a significant portion of Juniper's apparent

4

growth trend actually was attributable to the change in revenue recognition practices. *Id.* ¶¶ 59-60.

On June 1, 2011, Juniper disclosed that growth in certain segments of its business was slowing, and that 1Q11 had started "kind of on the weak side." *Id.* ¶ 153. Juniper's stock declined several dollars per share on this news. *Id.* ¶ 155. On July 25, 2011, Juniper announced "a major management reshuffling." *Id.* ¶ 159. On July 26, 2011, the last day of the Class Period, Juniper issued a press release reporting a year-over-year revenue increase of 15%, which was lower than its previous guidance of a year-over year revenue increase of between 16% and 21%. *Id.* ¶ 160. Juniper also reported non-GAAP gross margin of 65.6% and non-GAAP operating margin of 21.6%; these figures were significantly off previous guidance. *Id.* Juniper lowered guidance for 3Q11 and FY11, projecting revenue growth between 12% and 14% and operating margins between 19% and 21%. *Id.* On this news, Juniper's stock fell nearly 21% to $24.66 per share. *Id.* ¶ 171.

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the plaintiff's claims. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When determining whether a claim has been stated, the court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B. Federal Rule of Civil Procedure 9(b) and the PSLRA

In addition to the pleading standards discussed above, a plaintiff asserting a private securities

5

fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud. . . ." Fed. R. Civ. P. 9(b); *see also In re VeriFone Holdings*, 704 F.3d at 701. The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading. . . ." 15 U.S.C. § 78u–4(b)(1)(B). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). "To satisfy the requisite state of mind element, a complaint must allege that the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone Holdings*, 704 F.3d at 701 (internal quotation marks and citation omitted) (alteration in original). The scienter allegations must give rise not only to a plausible inference of scienter, but to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

### III. DISCUSSION

#### A. Section 10(b) of the Exchange Act and Rule 10b-5

Under Section 10(b) of the Exchange Act, it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 further provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). The elements of a claim under § 10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

### 1. Misrepresentations Re Long-Term Growth Projections

Plaintiffs assert that Defendants'[2] projections of revenue growth of 20+% and operating margin of 25% were false or misleading because Defendants knew that those projections were not realistic in light of Juniper's slowing sales, pricing pressure from competitors, problems with the JUNOS operating system, and the lack of an adequate sales force. SAC ¶ 34, ECF No. 87. In its July 23 Order, the Court concluded that Defendants' projections are protected under the PSLRA's "safe harbor" provision, which provides in relevant part that a defendant may not be held liable for a statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i); July 23 Order at 17-20, ECF No. 84. To the extent that any of the statements are not forward-looking – for example, statements that "Verizon and AT&T are strong partners," and that Juniper has "strong demand metrics and good momentum" – the Court held that the statements are vague, generalized assertions of corporate optimism that are not actionable. July 23 Order at 20-21; *see also In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) ("vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws"). Finally, the Court determined that even if Juniper's projections and related statements are not protected, Plaintiffs have failed to show that the statements are false or misleading. July 23 Order at 21-23.

Plaintiffs have not added any new allegations in response to the Court's determinations with respect to safe harbor and corporate optimism. Plaintiffs concede as much, stating in their opposition that: "Plaintiffs have realleged their claims that Defendants' revenue projections were false and misleading. Plaintiffs respectfully disagree with the Court's conclusion that these

---

[2] "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks and citation omitted) (alternation in original). Thus, if the Court were to conclude that some of the alleged statements are false and misleading, the Court would need to identify which defendants made which statements for purposes of analysis. Because Plaintiffs have not alleged facts showing that any of the alleged statements are false and misleading, the Court need not specify which defendants made which statements.

7

CASE NO. 5:11-CV-04003-LHK
ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT WITHOUT LEAVE

statements were protected by adequate cautionary language, and wish to preserve these claims in the event that an appeal becomes necessary." Opp'n at 18, ECF No. 99.

Plaintiffs have added three new paragraphs in response to the Court's determination that Juniper's revenue projections are not false and misleading. *See* SAC ¶¶ 48-50, ECF No. 87. Those paragraphs are based upon information received from a new confidential witness, CW6.[3] CW6 is a sales finance manager who worked at Juniper from September 2005 until May 2012. *Id.* ¶ 48. CW6 was responsible for managing Jupiter's annual operating expenditure budget for the Americas and conducting monthly meetings with each division vice president in the Americas. *Id.* Plaintiffs allege that CW6 "confirmed that throughout the Class Period, the Company's touted goal of 20% year-over-year revenue was not a realistic objective and was only achieved during FY10 as a result of the accounting rules change." *Id.* CW6 also "confirmed that during the Class Period, Juniper's business was adversely affected by a variety of factors including software problems relating to the JUNOS operating system and its incompatibility with the SRX product suite, slumping sales due to delayed release dates for major routing and switching products, and lower than expected sales force headcount." *Id.* ¶ 49. CW6 opined that Juniper's use of the new accounting rules provided it with "a cheap way" to meet its announced revenue targets notwithstanding the company's ongoing problems. *Id.* ¶ 50.

The problems identified by CW6 were described in detail in the amended complaint; the Court concluded that Plaintiffs had not shown that the problems rendered the company's projections unattainable. *See* July 23 Order at 5-6, 21-23, ECF No. 84. CW6 opines that the problems made the company's forecasts unrealistic. However, CW6 managed Juniper's *operating expenses*; the SAC does not indicate that CW6 played any role in Juniper's revenue forecasting or had any experience that would render CW6's opinion particularly reliable. The SAC does allege that "CW6 utilized . . . the Siebel system, which tracked financial forecasts and enabled users to conduct budget-to-actual variance analysis." SAC ¶ 48, ECF No. 87. It is unclear what import may be attributed to the fact that CW6 "utilized" the Siebel system. To the extent that Plaintiffs mean to allege that CW6 had

---

[3] Plaintiffs' prior allegations based upon information received from confidential witnesses CW1, CW2, CW3, CW4, and CW5 are unchanged from the amended complaint. *Compare* SAC §§ 35-47, ECF No. 87, *with* Am'd Compl. ¶¶ 31-43, ECF No. 47.

8

CASE NO. 5:11-CV-04003-LHK
ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT WITHOUT LEAVE

access to Juniper's internal financial forecasts, the Court notes the absence of any allegation that those forecasts showed that Juniper would not or could not meet its long-term projections.

Finally, CW6's statement that Juniper took "a cheap way" to meet its announced revenue targets appears to be pure speculation. Plaintiffs insist that although Juniper reported revenue growth of 24.4%, 22.9%, and 26.4% in 2Q10, 3Q10, and 4Q10, respectively, Juniper's *actual* revenue growth was only 17.7%, 16.8%, and 14.8%, respectively. SAC ¶ 55, ECF No. 87. However, Plaintiffs do not suggest that the revenue recognized by Defendants under ASU 2009-13 and ASU 2009-14 was not real or legitimate. Even accepting Plaintiffs' "actual" revenue growth figures, it is not as though Juniper was nowhere near its target – the fact that Juniper had "actual" revenue growth of 17.7% and 16.8% in 2Q10 and 3Q10 does not suggest that Defendants knew all along that revenue growth of 20% was impossible. To the contrary, the figures suggest that Juniper was within striking distance of its 20% target, but ultimately was not able to meet its goal. Plaintiffs' allegations simply do not give rise to a reasonable inference that Juniper's projections were false and misleading.

## 2. Failure to Disclose Effect of New Accounting Rules

In addition to asserting that Juniper's long term projections were false and misleading, Plaintiffs assert that Juniper's reported revenues were false and misleading because Defendants did not adequately disclose the impact of the company's adoption of ASU 2009-13 and ASU 2009-14. SAC ¶ 51, ECF No. 87. In its July 23 Order, the Court discussed at length the FASB disclosure requirements for companies in the transition period between old revenue recognition rules and new rules ASU 2009-13 and ASU 2009-14. July 23 Order at 7, ECF No. 84. The Court noted that Juniper in fact did disclose its adoption of ASU 2009-13 and ASU 2009-14 in its Forms 10-Q and 10-K for FY10.[4] *Id*. at 9. The Court concluded that those Forms disclosed the effect of Juniper's

---

[4] The Court took judicial notice of the relevant SEC filings when it addressed Defendants' prior motions to dismiss the amended complaint. July 23 Order at 13, ECF No. 84. In connection with the present motion, Defendants have filed an unopposed request for judicial notice of SEC filings and other documents, such as ASU 2009-13 and ASU 2009-14, that are incorporated by reference into the SAC. Defendants also request judicial notice of Juniper's Form 10-K for the year ended December 31, 2009, which is not incorporated by reference into the SAC. *Id*. Defendants' request for judicial notice is GRANTED in its entirety. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (courts may consider documents referenced in the complaint that are

adoption of the new rules in conformity with Example 1[5] of the FASB disclosure guidelines. *Id*. at 24. With respect to Plaintiffs' argument that Defendants "should have made a more fulsome disclosure as set forth in Example 3[6] of the FASB guidelines," the Court noted that "it is well established that the PSLRA does not impose a duty of completeness." *Id*. The Supreme Court has made clear that "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx*, 131 S. Ct. at 1321. Applying these standards to the allegations set forth in the amended complaint, the Court concluded that "Plaintiffs have . . . failed to plead facts showing that Defendants had an affirmative duty to provide further disclosures beyond what was already included in Juniper's SEC filings." July 23 Order at 24-25, ECF No. 84.

Plaintiffs rely upon the declaration of their expert, Stuart H. Harden ("Harden"), which they have attached as an exhibit to the SAC. *See* Harden Decl., SAC Ex. A, ECF No. 87-1. Harden is the managing partner of the Litigation and Forensic Accounting Services Group of Hemming Morse, LLP. *Id*. ¶ 2. He has more than thirty years of experience in public accounting, *id*., and is a member of the Emerging Issues Task Force of the FASB, *id*. ¶ 3. Harden offers his opinion that Juniper "has not disclosed information during the Class Period that enables users of its financial statements to understand the effect of the change in accounting principles resulting from Juniper's early adoption of Accounting Standards Update ("ASU") No. 2009-13 . . . and ASU No. 2009-14." *Id*. ¶ 4. He provides his reasoning in the following sixteen paragraphs of his declaration. *Id*. ¶¶ 5-20.

Plaintiffs previously submitted Harden's declaration in support of their opposition to Defendants' prior motions to dismiss the amended complaint. The Court granted Defendants'

---

central to the plaintiff's claim and as to which there is no question of authenticity); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (SEC filings are subject to judicial notice).

[5] Example 1 required "[d]isclosure of the amount of revenue that would have been recognized in the year of adoption if the related arrangements entered into or materially modified after the effective date were subject to the measurement requirements of [the old rules]." July 23 Order at 7, ECF No. 84; *see also* FASB Summary of ASU No. 2009-13 at 3-4, ECF No. 94-9.

[6] Example 3 required "[d]isclosure of the amount of revenue recognized in the reporting period and the amount of deferred revenue as of the end of the reporting period from applying (a) the guidance in [the old rules] and (b) the [new rules]." July 23 Order at 8, ECF No. 84; *see also* FASB Summary of ASU No. 2009-13 at 4, ECF No. 94-9.

motion to strike the declaration, citing *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2002), for the well settled proposition that a district court normally may not consider evidence outside the pleadings when addressing a motion to dismiss under Rule 12(b)(6). *See* July 23 Order at 15, ECF No. 84. Now the Court must determine whether Plaintiffs' attachment of the Harden declaration as an exhibit to their SAC alters its prior conclusion that the declaration may not be considered in the context of a motion to dismiss.

"A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). A "written instrument" within the meaning of Rule 10(c) is "a document evidencing legal rights or duties or giving formal expression to a legal act or agreement, such as a deed, will, bond, lease, insurance policy or security agreement." *DeMarco v. Depotech Corp.*, 149 F. Supp. 2d 1212, 1220 (S.D. Cal. 2001) (internal quotation marks and citation omitted). "The documents that satisfy this definition consist largely of documentary evidence, specifically, contracts, notes, and other writings on which a party's action or defense is based." *Id*. (internal quotation marks and citation omitted). The Ninth Circuit has held that "[a]ffidavits and declarations . . . are not allowed as pleading exhibits unless they form the basis of the complaint." *Ritchie*, 342 F.3d at 908. Most district courts within the circuit have concluded that it is inappropriate to consider an expert affidavit on a motion to dismiss under Rule 12(b)(6), whether or not the affidavit is attached to the complaint. *See, e.g., DeMarco*, 149 F. Supp. 2d at 1222 (questioning "whether any good reason exists for a plaintiff to attach an expert affidavit as an exhibit to a complaint"); *Montgomery v. Buege*, Case No. CIV 08-385 WBS KJM, 2009 WL 1034518, at *4 (E.D. Cal. Apr. 16, 2009) ("the practice of attaching to a complaint the kind of exhibits at issue here needlessly complicates challenges to the sufficiency of pleadings"). One district court has reached the opposite conclusion, holding that "there exists no inflexible rule governing the sort of written instrument that may be attached to a pleading." *The Mannkind Sec. Actions*, 835 F. Supp. 2d 797, 821 (C.D. Cal. 2011).

This Court is constrained by the Ninth Circuit's ruling in *Ritchie* and, in any event, agrees with the district courts that have held that expert affidavits are not appropriate exhibits to complaints. This Court finds particularly persuasive the *DeMarco* court's observation that "[t]he

11

1  inclusion of such an affidavit in no way relieves a plaintiff of its burden to comply with the Reform
2  Act and the applicable provisions of the Federal Rules of Civil Procedure." *DeMarco*, 149 F. Supp.
3  2d at 1221. "Because the Court must generally assume the truth of all material factual allegations in
4  a complaint, averments in an expert affidavit carry no additional probative weight merely because
5  they appear within an affidavit rather than numbered paragraphs of the complaint." *Id*. at 1222.
6  Accordingly, the Court declines to consider the Harden declaration in the context of the present Rule
7  12(b)(6) motion.

8        In addition to attaching the Harden declaration as an exhibit to the SAC, Plaintiffs copied
9  into the SAC itself Harden's opinions as to why Juniper's disclosures regarding its transition to
10  ASU 2009-13 and ASU 2009-14 were inadequate. *Compare* SAC ¶¶ 15-17, 65-67, 81-83, 92-94,
11  106-108, 116-18, 132-34, 191, ECF No. 87, *with* Harden Decl. ¶¶ 18-20, ECF No. 87-1. The Court
12  has considered all of the facts alleged in the SAC. However, Harden's "opinions cannot substitute
13  for facts under the PSLRA." *Fin. Acquisition Partners L.P. v. Blackwell*, 440 F.3d 278, 286 (5th
14  Cir. 2006); *see also In re Jones Soda Co. Sec. Litig.*, Case No. C07-1366RSL, 2009 WL 330163, at
15  *4 n.6 (W.D. Wash. 2009).

16        None of the new facts alleged in the SAC are sufficient to show that Juniper's disclosures
17  regarding its adoption of ASU 2009-13 and ASU 2009-14 were so deficient as to render Juniper's
18  financials false and misleading. Juniper's Form 10-Q for the period ending March 31, 2010, the
19  first quarter in which revenue was recognized under the new rules, expressly disclosed that:

> We adopted Accounting Standards Update ("ASU") No. 2009-13 "Multiple-Deliverable Revenue Arrangements" ("ASU 2009-13") and ASU No. 2009-14, "Certain Revenue Arrangements That Include Software Elements" ("ASU 2009-14") on a prospective basis as of the beginning of fiscal 2010 for new and materially modified arrangements originating after December 31, 2009.

Form 10-Q for period ending 3/31/2010 at 37, ECF No. 93-3. The Form stated that for transactions initiated prior to the first quarter of 2010, revenue would be recognized under the old rules, and described how revenue for multiple-element transactions is recognized under the old rules. *Id*. The Form distinguished the old rules from the new rules, explaining that:

> Under the new standards we allocate the total arrangement consideration to each separable element of an arrangement based on the relative selling price of each element. Arrangement consideration allocated to undelivered elements is deferred until delivery.

12

1  *Id*. The Form also provides much more detailed descriptions of the manner in which the new rules

2  are applied. *Id*. Finally, and of particular note here, the Form disclosed that:

> *As a result of the adoption of ASU 2009-13 and ASU 2009-14, net revenues for the first quarter of 2010 were approximately $25 million higher than the net revenues that would have been recorded under the previous accounting rules.* The increase in revenues was due to recognition of revenue for products booked and shipped during the first quarter of 2010, which contained deliverables for which we were unable to demonstrate fair value pursuant to the previous standards. We cannot reasonably estimate the effect of adopting these standards on future financial periods as the impact will vary depending on the nature and volume of new or materially modified arrangements in any given period.

8  *Id*. (emphasis added).

9        Juniper's subsequent Forms 10-Q and 10-K contained similar disclosures. Each of the Forms explained the specific criteria used by the company in recognizing revenue, and each expressly disclosed how much additional revenue had been recognized under ASU 2009-13 and ASU 2009-14 than would have been recognized under the old rules. *See* Form 10-Q for period ending 6/30/2010 at 7 ("As a result of the adoption of ASU 2009-13 and ASU 2009-14, net revenues for the three and six months ended June 30, 2010 were approximately $53 million and $78 million higher than the net revenues that would have been recorded under the previous accounting rules."), ECF No. 93-4; Form 10-Q for period ending 9/30/2010 at 6 ("As a result of the adoption of ASU 2009-13 and ASU 2009-14, net revenues for the three and nine months ended September 30, 2010, were approximately $50 million and $128 million higher, respectively, than the net revenues that would have been recorded under the previous accounting rules."), ECF No. 94; Form 10-K for period ending 12/31/2010 at 32-33 ("As a result of the adoption of ASU 2009-13 and ASU 2009-14, net revenue for the year ended December 31, 2010, was approximately $237 million higher than the net revenue that would have been recorded under the previous accounting rules.").

23       The Court again concludes that these disclosures comply with FASB guidelines. The disclosures were sufficient to inform the market that Juniper had transitioned to the new accounting rules effective January 1, 2010, and that Juniper was recognizing millions of dollars more in net revenue on a quarterly and yearly basis under the new accounting rules than it would have been able to recognize under the old accounting rules. Plaintiffs' new allegations in essence boil down to argument that Juniper had an obligation to spell out the effects of transitioning to ASU 2009-13 and

13

ASU 2009-14 in more detail. For example, Plaintiffs allege that Defendants should have disclosed the amount of deferred revenue recognized under the old accounting rules, *see* SAC ¶ 191(b); provided a breakdown of revenue deferred under the old and new accounting rules, *see* SAC ¶ 191(c); and disclosed the impact of the new accounting rules on "operating margins, net income or earnings per share," *see* SAC ¶ 191(a). Plaintiffs have failed to show that Juniper had an obligation to provide this information, that disclosure of the information would have significantly altered the "total mix" of information available to investors, *see TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976), or any other basis for concluding that Juniper's financial statements were false and misleading absent this additional information.[7]

### 3. Scienter

To state a claim for securities fraud, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In the Ninth Circuit, "the complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Because Plaintiffs have failed to allege any actionable false or misleading statements, they necessarily have failed to allege that Defendants made such statements intentionally or recklessly. Plaintiffs agree that "[t]his is the type of case where, as the Ninth Circuit observed, falsity and scienter merge." Opp'n at 18 (citing *In re Daou*, 411 F.3d at 1015). However, for the sake of completeness, the Court briefly addresses Plaintiffs' scienter allegations.

In its July 23 Order, the Court concluded that Plaintiffs had failed to allege sufficient facts to create a strong inference of scienter under either a core operations theory or a financial motive and opportunity theory. *See* July 23 Order at 25-30, ECF No. 84. The SAC adds only a few new allegations that are even conceivably relevant to the scienter inquiry: the three new paragraphs based

---

[7] The Court notes that Juniper's Form 10-K for FY 2009 disclosed the amount of deferred revenue recognized under the old accounting rules and carried on the company's balance sheet as of the end of 2009. Form 10-K for period ending 12/31/2009 at 87, ECF No. 93-1. The Court previously rejected Plaintiffs' argument that Juniper was obligated to make disclosures consistent with Example 3 of the FASB guidelines, which requires a breakdown of revenue deferred under the old and new accounting rules. July 23 Order at 24, ECF No. 84. It is not clear from where Plaintiffs draw the requirement that a company explain the impact of new accounting rules on operating margins, net income or earnings per share.

14

CASE NO. 5:11-CV-04003-LHK
ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT WITHOUT LEAVE

upon information received from CW6, discussed above, and an allegation that open market sales by insiders increased in 1Q11 as compared to 2009 and 2010. *See* SAC ¶¶ 20, 48-50. The SAC does not allege that CW6 had any contact with the individual defendants; thus, CW6 offers "little, if any, reliable basis from which to infer scienter." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, No. 10-CV-03451-LHK, 2012 WL 1868874, at *20 (N.D. Cal. May 22, 2012). At most, the allegations regarding CW6 might give rise to an inference that CW6 believed that Juniper's revenue growth projection of 20+% was unrealistic, and that because CW6 formed this belief, Juniper's officials must have formed the same belief. The allegation that insider sales increased in 1Q11 does not identify the "insiders." If the sales were by non-defendants, they are irrelevant to show motive on the part of the individual defendants. *See Wozniak v. Align Tech., Inc.*, No. C-09-3671, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011) ("Sales by insiders not named as defendants, however, are irrelevant to the determination of the named defendant's scienter."). The addition of these allegations is insufficient to alter the Court's prior conclusion that Plaintiffs have failed to allege facts showing scienter.

### B. Sections 20(a) and 20A

Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." A plaintiff suing under § 20(a) must demonstrate: (1) "a primary violation of federal securities laws" and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

Section 20A creates liability for "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information." 15 U.S.C. § 78t-1. A plaintiff suing under § 20A must show an independent violation of the securities laws. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

Because Plaintiffs have failed to state a claim for a primary violation of the securities laws, Plaintiffs likewise have failed to state a claim for violation of §§ 20(a) or 20A of the Exchange Act.

## IV. CONCLUSION

The Ninth Circuit has held that leave to amend should be granted with "extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). When considering whether to grant leave to amend, a district court should consider several factors: undue delay, bad faith, or dilatory motive; repeated failure to cure deficiencies by amendments previously allowed; undue prejudice to the opposing party; and futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Eminence Capital*, 316 F.3d at 1052. There is no evidence of undue delay or bad faith on the part of Plaintiffs or of prejudice to Defendants if leave to amend were granted. However, the Court's July 23 Order set forth the deficiencies in the amended complaint in great detail, and Plaintiffs were unable to cure those deficiencies when granted leave to amend. Based upon the new allegations in the SAC, it does not appear that Plaintiffs would be able to state a viable claim even if they were afforded another opportunity to amend. The Court's July 23 Order informed Plaintiffs that the action would be dismissed with prejudice if the deficiencies identified therein were not cured by the SAC. Accordingly, the motion is GRANTED WITHOUT LEAVE TO AMEND, and the action is DISMISSED WITH PREJUDICE. The Court vacates the July 17, 2013 Case Management Conference. The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: May 17, 2013

LUCY H. KOH
United States District Judge

CASE NO. 5:11-CV-04003-LHK
ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT WITHOUT LEAVE